## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Spring Piatek, Individually and as Next Friend of Lily Piatek and Theodore Piatek, and as Administrator of the Estate of Timothy Piatek, and on behalf of all others similarly situated, | |
| *Plaintiff*, | **Case Number: ___-cv-_____** |
| v. | |
| Norazza, Inc. | |
| *Defendant*. | |

## CLASS ACTION COMPLAINT

TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   PARTIES .......................................................................................................... 8

III.  JURISDICTION & VENUE............................................................................... 8

IV.  FACTS ............................................................................................................. 9

   A.   Tim Piatek's death .................................................................................... 9

   B.   The emergence of computer dusters as a highly-addictive inhalant – the data reveals a public health crisis .......................................................................................................... 11

      1. The National Survey on Drug Use and Health ................................................ 11

      2. The National Poison Data System ................................................................. 12

      3. The National Electronic Injury Surveillance System........................................ 17

      4. Though Curated for the Benefit of Computer Duster Manufacturers, Media Reports Collected and Posted by the Alliance for Consumer Education Further Demonstrate the Scope of the Huffing Problem ...................................................................................... 19

      5. Locally enacted bans on sales of computer duster.............................................. 21

   C.   Huffing and the addictive nature of DFE – a deadly combination ................... 21

   D.   The numbers of deaths attributed to huffing are significant and rising ............ 29

   E.   The CPSC has voted to initiate rulemaking concerning DFE-based dusters.......... 32

   F.   Endust and its competitors – content of the duster cans and subsequent addition of bitterant due to foreseeable use as an inhalant............................................................. 33

   G.   DB is ineffective at deterring huffing and may increase the risks of huffing.......... 39

      1. DB — A bitter denaturant used to prevent accidental poisoning ..................... 40

      2. DB has not been added at the necessary concentration to deter abuse .............. 41

      3. Differences between accidental ingestion and intentional ingestion have been ignored.. 42

      4. Other considerations make DB an improper bitterant in this application........................ 46

   H.   Independent tests show that DB is not present in the quantity Norazza represents or at the threshold level of detectability to most human subjects .......................................... 47

V.    CLASS ACTION ALLEGATIONS ................................................................... 50

VI.  CLAIMS FOR RELIEF ................................................................................... 55

      COUNT I: STRICT PRODUCTS LIABILITY – DESIGN DEFECT ............................ 55

      COUNT II:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN .................... 61

      COUNT III: STRICT PRODUCTS LIABILITY –MANUFACTURING DEFECT ....... 64

      COUNT IV:  NEGLIGENT DESIGN DEFECT ................................................... 67

      COUNT V:  NEGLIGENT FAILURE TO WARN........................................................ 71

      COUNT VI:  WRONGFUL DEATH .............................................................................. 75

      COUNT VII: SURVIVORSHIP ..................................................................................... 76

COUNT VIII: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ..... 77

COUNT IX:  BREACH OF EXPRESS WARRANTY ...................................................... 77

COUNT X – WILLFUL AND WANTON CONDUCT .................................................... 79

Plaintiff Spring Piatek ("Plaintiff" or "Piatek"), individually and as Next Friend of Lily Piatek and Theodore Piatek, and as Independent Administrator of the Estate of Timothy J. Piatek, and on behalf of all others similarly situated, for her complaint against Norazza, Inc. ("Norazza") alleges as follows:

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## I.    INTRODUCTION

1.    Inhalant abuse is a rampant yet underreported public health crisis in the United States. A recent national survey found that 2.4 million people aged 12 and over reported using inhalants in 2020 alone. Of these individuals, 215,000 are estimated to have an inhalant abuse disorder.[1] Yet, inhalant abuse has been termed "the forgotten epidemic."[2]

2.    Inhalants are extremely toxic to the human body and can have profound effects on the nervous system and other organs.[3] Scientific research has shown that prolonged use can cause neurological damage, resulting in cognitive abnormalities and permanent brain damage.[4] Chronic exposure to these toxins can also cause damage to other organs and bodily systems, particularly to the heart, lungs, liver, and kidneys.[5]

---

[1] SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2020 National Survey on Drug Use and Health*, at 16, 27-29 and Table A.26B (www.samhsa.gov/data). *See also*, NATIONAL INSTITUTE ON DRUG ABUSE, *How Are Inhalants Used?*, April 13, 2020, at 4.

[2] Carter Sherman, Inhalants – *The Easy to Acquire but Deadly Drug That Nobody Talks About*, HOUSTON PRESS, Sept. 6, 2016, at 3.

[3] NATIONAL INSTITUTE ON DRUG ABUSE, *What are the Other Medical Consequences of Inhalant Abuse?*, May 20, 2022, at 8-10, https://nida.nih.gov/publications/research-reports/inhalants/what-are-other-medical-consequences-inhalant-abuse.

[4] *Id*.

[5] *Id*.

3.      Despite carrying such extreme physiological risks, including death, the chemicals used in some categories of inhalants would seem innocuous to the average person. They may be colorless, odorless, and tasteless. Yet looks can be deceiving. These are highly addictive substances that can cause catastrophic injury, including brain damage or death, even to a first-time user.

4.      Moreover, inhalants are relatively inexpensive to manufacture and thus highly accessible as a means to get intoxicated. Gram for gram, inhalants may be the cheapest, easiest, and one of the fastest ways for a user to get "high," and these products can be purchased, in bulk, at the local hardware store, office supply store, grocery store or, in some cases, even the gas station.

5.      The most common cause of death from inhalants is cardiac arrest.

6.      Inhalants cause the heart to beat at an abnormal rate, known as cardiac arrhythmia, which also increases the heart's sensitivity to the hormone adrenaline. The body releases adrenaline as a response to stress. For a person intoxicated on inhalants, any sudden rush of fear, excitement, or surprise could result in cardiac arrest.[6]

7.      Another common cause of death from inhaling is known as Sudden Sniffing Death Syndrome, which occurs when the gas component of aerosol blocks the body's normal flow of oxygen, also leading to cardiac arrest.[7]

---

[6] R.T. Shepherd, *Mechanism of Sudden Death Associated With Volatile Substance Abuse*, 8 HUMAN TOXICOLOGY 287, 287-291 (1989). *See also*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2794702/#:~:text=Cardiac%20arrest%20%E2%80%93%20Chemicals,to%20inhalant%20abuse.

[7] www.drugrehab.com/addiction/drugs/inhalants/sudden-sniffing-death-syndrome/.



8.      Huffing injuries and deaths also contribute to motor vehicle accidents and drownings due to the user being intoxicated while driving or being near water while abusing inhalants.[8]

9.      Computer dusters are one of the most accessible and frequently abused inhalants. Dusters are composed almost entirely of 1-1, Difluoroethane ("DFE"), an odorless gas listed as HFC-152a. When inhaled, DFE causes intense and immediate intoxication. The intoxication is also short-lived and undetectable in workplace drug tests, which makes dusters a prime target for abuse. Huffing DFE also results in a loss of motor control and impaired judgment, leading to numerous accidents and deaths.

10.      Dusters are cheap and readily available at most big-box and small retailers. Upon information and belief, over ***20 million DFE dusters are sold every year*** – the bulk of which are sold to individuals seeking to get high, thus feeding a growing public health crisis. Industry sales are estimated to be over $160 million per year.

11.      Computer dusters cost as little as $1.89 per can. All are available in multipacks and do not feature warnings about inhalant addiction or guidance to prevent inhalant abuse. Defendant

---

[8] Janet F. Williams, et al, *Inhalant Abuse*, 119 J. AM. ACAD. OF PEDIATRICS 1009, 1009-1017 (2007), available at www.pediatrics.org/cgi/doi/10.1542/peds.2007-0470.

Norazza has worked to ensure that dusters continue to be sold without regard to purchaser's age and without restriction on number of cans purchased.

12.    Defendant Norazza designs, manufactures, tests, labels, markets, and distributes Endust. Endust is Norazza's trademark brand name.



13.    Norazza also private labels its flagship brand Endust on behalf of third parties. These duster products are identical in composition to Endust.

14.    Each of these computer dusters are identical in composition; all are composed almost entirely of DFE and contain a trace amount of a bitterant known as denatonium benzoate ("DB").

15.    Defendant Norazza has known for decades of the foreseeable danger with its duster products. Rather than fix its defective design and adequately warn of foreseeable dangers, Defendant Norazza instead exploited a vulnerable population for its own gain. It is complicit in creating the public health crisis of inhalant abuse because it is aware of the extremely addictive nature of DFE yet continues to promote these cheap computer dusters for easy consumption by individuals addicted to huffing who frequent stores again and again purchasing multipacks on each visit.

16.     Defendant Norazza fails to provide a warning that inhaling DFE is extremely addictive, which increases the risk of injury and death to inhalant users. And it falsely warrants that a bitterant was added which would help deter inhalant abuse.

17.     When Defendant Norazza started to receive pushback in the early 2000s related to the injuries and deaths from its products, Defendant Norazza began to include the bitterant denatonium benzoate ("DB") in its cans of computer duster to forestall inquiry. Indeed, big box retailers began requiring the addition of bitterant to the product due to the increased huffing of inhalants like duster products. However, the inclusion of DB—and the representations that the bitterant deters abuse—is misleading, deceptive, fraudulent, and unreasonably dangerous for multiple reasons.

18.     First, by design, in the manner and quantity in which it is added to computer dusters, DB has no meaningful impact because it is undetectable in the gas vapor phase. And, even if added in the quantity stated in patents, it would never trigger an actual deterrent effect upon huffing. To date, no scientific report provides evidence that DB deters inhalant abuse.

19.     As evidence of the failure of DB as a deterrent, huffing-related injuries and deaths have increased exponentially since the addition of the bitterant to these cans.[9]

20.     Second, Defendant Norazza is aware that DB is among a class of bitter substances that a significant portion of the population cannot detect. Namely 15-30% of the adult population has a genetic trait which renders them incapable of detecting the bitter taste of certain molecules.[10]

---

[9] Mathias B. Forrester, *Computer and Electronic Duster Spray Inhalation (Huffing) Injuries Managed at Emergency Departments*, 46 AM. J. DRUG ALCOHOL ABUSE 180, 180–183 (2020).

[10] U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS 18 (1992).

Defendant Norazza fails to provide a warning that its bitterant could be undetectable in huffing scenarios.

21.     Finally, and perhaps most damning to the duster industry's promises regarding the deterrent effect of the bitterant, DB is a bronchodilator which relaxes muscles in the lungs and widens the inhalant abuser's airways. As a result, DB *increases* the amount of DFE which the inhalant abuser might otherwise absorb into their lungs while huffing. This operates to make huffing the duster even riskier and more dangerous than it otherwise would be absent the bitterant.[11]

22.     Defendant Norazza knew that: (1) DFE is extremely addictive and required a warning of its addictive nature due to the foreseeable use of the product for huffing; (2) the addition of DB did not deter the foreseeable huffing, (3) a significant portion of the population cannot taste DB in any quantity, and (4) the inclusion of DB in any amount presented a greater risk to the foreseeable huffing.

23.     Yet, despite these known problems with DB, Defendant Norazza warrants on each of their duster cans that the added bitterant will help to deter or discourage inhalant abuse, as shown in the images below. This warranty is false, intentionally misleading, and increases the danger to consumers.

---

[11]  Brian E. Perron et al., *Potentially Serious Consequences for the Use of Bitrex as a Deterrent for the Intentional Inhalation of Computer Duster Sprays*, 39 FORENSIC TOXICOLOGY 286 (2021), available at http://link.springer.com/10.1007/s11419-020-00559-2.



*Figure 1 - Endust warranty*

24.     Defendant Norazza's labels are inadequate for multiple reasons including insufficient warnings on some foreseeable dangers and non-existent warnings for other foreseeable dangers. Despite the ineffectiveness of the bitterant and the dangers of DFE, Defendant Norazza provides express assurances that DB will "discourage inhalant abuse." Defendant Norazza only provides minimal, general warnings that abuse of the products "may be harmful" or "fatal," which Defendant then cancels out by reassuring consumers that their products were designed to prevent abuse. Defendant's products also do not provide any express warnings on addiction and the specific injuries that can result from huffing.

25.     When an individual passes away from cardiac arrest or Sudden Sniffing Death Syndrome attributed to huffing, their official cause of death is generally termed "1,1-difluoroethane toxicity." This was Timothy J. Piatek's official cause of death after he was found deceased in his mother's home with a can of Endust between his legs.

26.     Leading up to his death, Timothy (also known as Tim) had developed an addiction to the DFE in Defendant Norazza's Endust products. He visited numerous retailers on a weekly and oftentimes daily basis to feed his addiction. Defendant Norazza caused Tim's deadly addiction, injuries, and subsequent death.

27.     Tim's death, and the deaths of many others, could have been avoided had Norazza not negligently and defectively designed, tested, labeled, marketed, and distributed Endust.

## II.     PARTIES

28.     Plaintiff Spring Piatek is an adult resident citizen of Cook County, Illinois. Plaintiff is decedent Tim Piatek's surviving spouse. At the time of his death, Tim Piatek was a citizen of Cook County, Illinois. The Circuit Court of Cook County, Illinois, County Department – Probate Division, issued Letters of Office  appointing Spring Piatek as Independent Administrator of Tim Piatek's estate. (See Exhibit A, attached hereto.) Tim and Spring Piatek had two minor children at the time of Tim's death, Lily Piatek and Theodore Piatek, both of whom are represented by their mother in this case. Spring Piatek is hereafter referred to as "Plaintiff Piatek" or "Ms. Piatek".

29.     At the time of his death, Tim Piatek intended to remain domiciled in Cook County, Illinois, indefinitely.

30.     Defendant Norazza, Inc. is a New York Corporation with its principal place of business at 3938 Broadway, Buffalo, New York 14227. At all relevant times, Norazza designed, manufactured, tested, labeled, marketed and distributed Endust and private label versions of Endust for sale and use in the United States including within the State of Illinois.

## III.     JURISDICTION & VENUE

31.     <u>Subject Matter Jurisdiction</u>.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 class members. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and (c), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff is diverse from Defendant.

32.     <u>Personal Jurisdiction</u>.  The Court has personal jurisdiction over Norazza because Defendant regularly conducts business in the State of Illinois, sold Endust in the State of Illinois,

and actively sought to serve the market for Endust in the State of Illinois. Norazza designed, marketed, manufactured, tested, labeled, and distributed Endust for nationwide sale and consumption including to some of the largest national retailers – Norazza never sought to avoid distribution and sale of Endust in Illinois. Indeed, Norazza sold millions of cans of Endust every year including large numbers in Illinois. In addition, Norazza committed tortious acts in the State of Illinois and Plaintiff's claims arise out of such acts, and/or because Norazza otherwise made or established contacts in the State of Illinois sufficient to permit the exercise of personal jurisdiction.

33.    <u>Venue</u>.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred in this judicial district: Defendant Norazza sold Endust through representatives and resellers located in this judicial district; the decedent purchased Endust computer dusters from representatives and resellers located in this judicial district; Tim Piatek died of 1,1-difluoroethane toxicity in this judicial district and resided in this judicial district at the time of his death; Tim's estate was established and is administered in this district; and Plaintiff (his surviving spouse) and decedent's two minor children reside in this district. Further, Norazza through its representatives and resellers, marketed, distributed, and sold Endust computer dusters to millions of consumers across the United States, including in the Northern District of Illinois.

## IV.    FACTS

### A.    Tim Piatek's death

34.    Tim became addicted to Defendant Norazza's duster products in late 2021 or early 2022 after being introduced to the immediate and intense intoxication from huffing DFE. DFE addiction quickly took over Tim's life and lead to his death within a matter of months.

35.     Tim was a successful high school administrator who served as the Division Head for English in District 214. He also taught English at Wheeling High School, located in a suburb of Chicago.

36.     Unbeknownst to his family, Tim began huffing and developed a serious addiction to DFE.

37.     Ultimately, Tim's addiction spiraled out of control. His erratic behavior impacted his marriage and family, leading his wife to call the police on numerous occasions fearing for his safety and her own.

38.     Aside from erratic behavior, Tim began experiencing soreness and pain which led to medical treatment. Imaging revealed that Tim had abnormal bone lesions. After testing, he was diagnosed with Paget's Disease, a chronic condition which causes bones to grow abnormally and then weaken. Researchers have linked skeletal disorders leading to abnormal bone growth to inhalation of DFE.[12]

39.     Tim's condition continued to deteriorate and ultimately he was found dead at his mother's home on May 25, 2022. Tim Piatek was 44 years old. He left behind his spouse and two minor children, ages 5 and 3 at the time of his death.

40.     The police report and scene investigation found a can of Endust between Tim's legs and numerous cans of Endust in his car. His autopsy report listed "1,1-difluoroethane toxicity" as his cause of death. His death was termed an "accident."

---

[12] Tucci, J.R., et al, *Skeletal Fluorosis Due to Inhalation of a Difluoroethane-Containing Computer Cleaner*, 32 J. BONE MINER RES. 188 (2016).

10

B. **The emergence of computer dusters as a highly-addictive inhalant – the data reveals a public health crisis**

1. <u>**The National Survey on Drug Use and Health**</u>

41.     Tim Piatek is not alone. The National Survey on Drug Use and Health ("NSDUH"), administered annually by the Substance Abuse and Mental Health Services Administration, found that 678,000 Americans initiated inhalant use in 2020.[13] Inhalants outpaced cocaine, sedatives, methamphetamine, and heroin as the choice of substance for first-time abuse.[14]

42.     This statistic is not surprising considering that cocaine, methamphetamine, and heroin are illegal and sedatives are a controlled substance, while most inhalants are neither illegal nor controlled. Computer dusters, in particular, are inexpensive, readily available, and there are no controls on frequency of purchase or number of cans per purchase.

43.     In terms of overall inhalant use, the 2020 NSDUH found that among those individuals aged 12 or older, 2.4 million people used inhalants.[15] This figure is up 400,000 from the 2018 National Survey, representing *a 20% increase over a two-year period*.[16]

44.     NSDUH did not include dusters as a discrete inhalant type in its survey until 2015. Prior to 2015, the survey only asked if individuals had abused any "other" products and relied upon the individual to recall computer dusters. When individuals were specifically asked whether they had abused computer dusters, a more accurate picture of huffing emerged – an exponential

---

[13] NSDUH is an authoritative source for epidemiological data on tobacco, alcohol, and drug use; mental health; and other health-related issues in the U.S. This survey is conducted in all 50 states and in the District of Columbia. *See* SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMINISTRATION, U.S. DEPT. HEALTH & HUMAN SERVICES, KEY SUBSTANCE USE & MENTAL HEALTH INDICATORS IN THE UNITED STATES: RESULTS FROM THE 2020 NATIONAL SURVEY ON DRUG USE & HEALTH 25 (Oct. 2021).

[14] *Id*. at 23-25.

[15] *Id*. at 16.

[16] *Id.* at 17.

increase compared to the prior method of estimating. As shown below, including dusters in the "other" category resulted in grossly underestimating the prevalence of huffing dusters.[17]



## 2. The National Poison Data System

45.     Data from the National Poison Data System ("NPDS") of the National Poison Control Center also shows alarming increases in duster use and resulting injury or death. A scientific study published in 2010 in the American Academy of Pediatrics found that while some

---

[17] *See* https://nsduhweb.rti.org/respweb/homepage.cfm

types of inhalant use—such as sniffing gasoline or paint—have been declining since 1993, use of propellants like dusters has skyrocketed since 2003.[18]



46.     NPDS is a data warehouse for 55 poison control centers across the U.S. The results from this study involved human cases with an exposure route of inhalation with intentional use as a reason. Intentional use was defined as "an exposure resulting from the intentional, improper or incorrect use of a substance where the victim was likely attempting to achieve a euphoric or psychotropic effect."[19]

47.     An expert review of the NPDS data found that for the period of 1993 through 2008, the overall number of inhalant-related calls to poison control decreased by 33%. Yet, while there

---

[18] Melinda R. Marsolek, Nicole C. White & Toby Litovitz, *Inhalant Abuse: Monitoring Trends by Using Poison Control Data*, 1993-2008, 125 PEDIATRICS 906, 906-913 (May 2010), available at https://publications.aap.org/pediatrics/article-abstract/125/5/906/72520/Inhalant-Abuse-Monitoring-Trends-by-Using-Poison?redirectedFrom=fulltext.

[19] *Id.*

was a general decline in inhalant huffing, there was a significant increase in use of propellants, with computer dusters being far and away the most commonly used propellant.[20]

48.     To further illustrate the emergence of computer dusters as the drug of choice for inhalant users, Melinda Marsolek and her colleagues provided a breakdown of the 25 most frequently implicated inhalant products. According to this research, computer dusters ranked the 7th most fatal inhalant product, ranked 3rd by all major effects, 4th by death, and 8th on the overall hazard index.[21]

---

[20] *Id.*

[21] *Id.*

The 25 Most Frequently Implicated Products Ranked According to Fatality Rate for All Single-Substance Cases

| Product | All | Major Effects | Deaths | Hazard Index[a] | Fatality Rate[b] |
|---|---|---|---|---|---|
| All substances | 30 094 | 705 | 167 | 29.0 | 5.5 |
| Butane | 620 | 19 | 36 | 88.7 | 58.1 |
| Propane | 270 | 9 | 7 | 59.3 | 25.9 |
| Air fresheners | 1239 | 22 | 27 | 39.5 | 21.8 |
| Nitrous oxide | 731 | 18 | 10 | 38.3 | 13.7 |
| Carburetor cleaners | 582 | 43 | 5 | 82.5 | 8.6 |
| Fluorocarbons/freon | 1631 | 59 | 14 | 44.8 | 8.6 |
| Dusters | 2457 | 69 | 13 | 33.4 | 5.3 |
| Nitrites/nitrates | 431 | 16 | 2 | 41.8 | 4.6 |
| Toluene/xylene | 1096 | 48 | 5 | 48.4 | 4.6 |
| Adhesive/glue | 1105 | 18 | 4 | 19.9 | 3.6 |
| Hair spray | 279 | 2 | 1 | 10.8 | 3.6 |
| Disinfectants | 347 | 4 | 1 | 14.4 | 2.9 |
| Polishes/waxes | 350 | 5 | 1 | 17.1 | 2.9 |
| Paint thinner | 458 | 14 | 1 | 32.8 | 2.2 |
| Typewriter correction fluid | 566 | 4 | 1 | 8.8 | 1.8 |
| Paint | 3036 | 80 | 5 | 28.0 | 1.6 |
| Gasoline | 4329 | 72 | 7 | 18.2 | 1.6 |
| Helium | 689 | 9 | 1 | 14.5 | 1.5 |
| Formalin/formaldehyde | 197 | 6 | 0 | 30.5 | 0.0 |
| Deodorant | 302 | 3 | 0 | 9.9 | 0.0 |
| Ethanol (nonbeverage) | 233 | 2 | 0 | 8.6 | 0.0 |
| Albuterol | 415 | 1 | 0 | 2.4 | 0.0 |
| Marker/ink | 419 | 1 | 0 | 2.4 | 0.0 |
| Nail polish remover | 182 | 0 | 0 | 0.0 | 0.0 |
| Nail polish | 160 | 0 | 0 | 0.0 | 0.0 |

[a] The hazard index was calculated as the number of cases that resulted in major effects or death per 1000 cases.
[b] The fatality rate was calculated as the number of cases that resulted in death per 1000 cases.

49.     Another notable finding by Marsolek's study was the change in prevalence of propellants over four years by state—from 2002-2004 to 2006-2008. The data broken down by state showed a ***300% increase in total calls*** regarding propellants from 2003 to 2008. 47 states reported an increase, 14 states reported an exponential increase, and no states reported a decrease

in total number of calls. And, again, the vast majority of these calls were attributed to use of computer duster.[22]



Change in prevalence of propellant cases according to state, A, 2002–2004 vs B, 2006–2008.

---

[22] *Id.*

50.     Importantly, this data does not capture the full scope of computer duster use as some addicts seek treatment at acute care facilities, may die from cardiac arrest or Sudden Sniffing Death Syndrome, or forego treatment.

### 3.   The National Electronic Injury Surveillance System

51.     Data from the National Electronic Injury Surveillance System ("NEISS") is another resource which proves that the frequency of huffing has increased to the point of becoming a public health crisis.

52.     NEISS is a database maintained by the U.S. Consumer Product Safety Commission which catalogs injuries treated at a broad sampling of 100 hospital emergency departments, which have at least 6 beds and 24-hour emergency care. Experienced coders review this data from emergency room ("ER") visits and enter demographic, injury, and treatment information into the NEISS database.[23] This database represents the core of the CPSC's Bureau of Epidemiology. A 2020 study by Mathias Forrester, published in the American Journal of Drug and Alcohol Abuse, used data from NEISS to estimate the number of ER visits due to use of dusters for the period 2001-2017.[24] Brian E. Perron, PhD, a Professor at the University of Michigan, updated Forrester's findings through 2018 and included other inhalant types for comparison. The data shows that computer dusters account for more visits than all other categories of inhalants combined.

---

[23] https://www.cpsc.gov/es/Research--Statistics/NEISS-Injury-Data

[24] Mathias B. Forrester, *Computer and electronic duster spray inhalation (huffing) injuries managed at emergency departments* 46 AM. J. DRUG ALCOHOL ABUSE 180, 180-183 (2020).



53.     Overall, according to the analysis of NEISS records by Dr. Perron and Mr. Forrester, computer dusters accounted for more ER visits than any other inhalant on an annual basis from 2011-2018.[25] Specifically, dusters account for 16,927 out of a total of 30,095 inhalant-related ER visits—56.2% of all inhalant-related ER visits.

---

[25] *Id.*



4. **Though Curated for the Benefit of Computer Duster Manufacturers, Media Reports Collected and Posted by the Alliance for Consumer Education Further Demonstrate the Scope of the Huffing Problem**

54. The Alliance for Consumer Education is a non-profit organization which was formed in 2000 by the Household and Commercial Products Association, a trade organization heavily supported by duster manufacturers including Defendant Norazza.[26]

55. ACE operates as a clearinghouse for media reports concerning inhalation abuse and purports to offer common sense suggestions to prevent inhalant abuse. For example, ACE offers a

---

[26] https://www.consumered.org/

tool kit including an inhalant abuse quiz and lesson plan for teachers about the dangers of inhalant abuse.[27]

56. While ACE does report some data on the prevalence of inhalant abuse, its website makes no effort to track deaths attributed to huffing computer dusters. Indeed, its website states: "[T]he number of lives claimed by inhalant abuse each year is unknown because these deaths often are attributed to other causes."[28] ACE makes no mention of the fact that acute 1,1-Difluoroethane intoxication is a cause of death specifically due to huffing DFE, or that data tracking the number of annual deaths from this particular category is available upon request to individual medical examiners' offices.

57. Nonetheless, ACE—the industry trade group—has repeatedly acknowledged media reports and press information demonstrating that huffing DFE is addictive and is a foreseeable use of computer dusters. Specifically, Brian E. Perron, PhD, analyzed the reports available on ACE's website through 2020 and found 1,012 reports of inhalant abuse attributed to computer dusters. This number far exceeded the reports attributed to all other types of inhalants combined.



---

[27] https://www.consumered.org/programs/inhalant-abuse-prevention/teaching-resources.

[28] https://www.consumered.org/programs/inhalant-abuse-prevention/data-research.

### 5. <u>Locally enacted bans on sales of computer duster</u>

65. Issues related to huffing have also led to local bans on the sale of dusters. Specifically, the small town of Bald Knob, Arkansas, population approximately 3,000, passed an ordinance in late 2020 banning the sale of computer dusters within city limits.[29]

66. Police Chief Larry House reported that prior to the ban, the police were receiving 5-8 calls per week related to huffing. After the ordinance was passed instituting a ban, the huffing-related calls went to zero.

67. The nearby town of Pangburn, Arkansas is reportedly considering instituting a similar ordinance banning sales of computer dusters.[30]

68. Taken as a whole, this evidence points to an alarming increase in huffing which has impacted even some of the smallest communities in the U.S. Huffing DFE dusters is a public health crisis.

### C. Huffing and the addictive nature of DFE – a deadly combination

69. According to the National Institute of Drug Abuse ("NIDA"), "addiction" is chronic, relapsing disorder characterized by compulsive drug seeking, continued use despite harmful consequences and long-lasting changes in the brain. "Abuse" is defined as misusing a substance to get high.

---

[29] https://www.thedailycitizen.com/news/bald-knob-council-approves-banning-sale-of-air-duster-if-city-legally-can/article_ae0ccf7d-6f38-5474-8399-d7df401415d2.html?utm_medium=social&utm_source=email&utm_campaign=user-share. *See also*, https://www.thedailycitizen.com/news/bald-knob-goes-through-with-ban-on-sale-of-air-duster-products/article_3ed7df37-1a25-5146-9204-19d9fd19f1ee.html.

[30] https://www.thedailycitizen.com/news/pangburn-watching-bald-knobs-duster-ban/article_53297891-adee-5f4a-9c31-71c100839517.html.

70. If a person compulsively uses computer dusters and meets the Diagnostic and Statistical Manual of Mental Disorders ("DSM") criteria for inhalant use disorders, as shown below, the person would be assigned this disorder with a DFE specifier.

*Table 1- Criteria for the diagnosis of inhalant use disorders from the 5th version of the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-5)*

Diagnostic Criteria

A. A problematic pattern of use of a hydrocarbon-based inhalant substance leading to clinically significant impairment or distress, as manifested by at least two of the following, occurring within a 12-month period:

   1. The inhalant substance is often taken in larger amounts or over a longer period than was intended.

   2. There is a persistent desire or unsuccessful efforts to cut down or control use of the inhalant substance.

   3. A great deal of time is spent in activities necessary to obtain the inhalant substance, use it, or recover from its effects.

   4. Craving, or a strong desire or urge to use the inhalant substance.

   5. Recurrent use of the inhalant substance resulting in a failure to fulfill major role obligations at work, school, or home.

   6. Continued use of the inhalant substance despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of its use.

   7. Important social, occupational, or recreational activities are given up or reduced because of use of the inhalant substance.

   8. Recurrent use of the inhalant substance in situations in which it is physically hazardous.

   9. Use of the inhalant substance is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance.

   10. Tolerance, as defined by either of the following:

      a. A need for markedly increased amounts of the inhalant substance to achieve intoxication or desired effect.

      b. A markedly diminished effect with continued use of the same amount of the inhalant substance.

*Specify* **the particular inhalant:** When possible, the particular substance involved should be named (e.g., "solvent use disorder").

71. Per NIDA, a substance is considered addictive if: (1) the substance impacts the brain's circuitry; and (2) changes produce compulsive use despite harmful consequences.

72. At least 12 case studies support the broad consensus that DFE is highly lipophilic, crosses the blood-brain barrier, directly affects the central nervous system, stimulates the gamma-aminobutyric acid ("GABA") receptors, and inhibits the N-methyl-D-aspartate ("NMDA") receptors. These studies indicate that DFE meets the first element for being an addictive substance:

22

| **Causal Explanation from Case Reports of Intoxication from DFE** |
|---|
| "This refrigerant, used as a propellant in spray cans, is believed to exert its psychoactive effects by stimulating the GABA receptors and by inhibiting the NMDA receptors; other studies suggest that inhalants promote the release of dopamine in specific brain areas (Kurniali et al., 2012; Garland and Howard, 2012; Bass, 1970; Jevtovic-Todorovic et al., 1998 )..."[31] |
| "DFE is a central nervous system (CNS) depressant associated with a brief sensation of euphoria when inhaled. Prolonged or excessive use is associated with toxicity, and abrupt cessation can induce withdrawal ... DFE acts as a CNS depressant via glutamate and γ-aminobutyric acid receptors, causing a brief euphoria when inhaled."[32] |
| "Hydrocarbon inhalants rapidly access the central nervous system because of their lipophilicity. Here, these inhalants stimulate gamma-aminobutyric acid (GABA) receptors, causing inhibition in the central nervous system similar to the effects of ethanol. This can cause euphoria, disorientation, agitation, and impaired judgment. Because euphoria is often experienced, difluoroethane abuse is associated with patients presenting with anhedonia and other depressive symptoms, much like the patient of this case. It provides a rapid high which in turn dissipates within a matter of minutes, making it both highly desirable and highly dangerous for its abusers."[33] |
| The sought after euphoria or "high" can also be accompanied by central nervous system depression due to the extreme lipophilic properties of the gas and increased gamma-aminobutyric acid type A receptor affinity.[34] |
| "This compound has a high degree of lipophilicity which, when inhaled, crosses the blood brain barrier causing a state of euphoria and CNS depression. Serious toxicity from acute exposure is almost always from deliberate abuse or occupational exposure in a confined space, either from dysrhythmia or simple asphyxia from displacement of oxygen."[35] |

[31] Ermelinda Levari et al., *The Dangerous Use of Inhalants Among Teens: A Case Report*, 1 EMERGING TRENDS IN DRUGS, ADDICTIONS, AND HEALTH 100006, at 2 (2021).

[32] Adam Custer, Andrew Corse & Sondra Vazirani, *Difluoroethane Inhalant Abuse, Skeletal Fluorosis, and Withdrawal*, 37 FED. PRACTITIONER 288–289 (2020).

[33] Clara B. Novotny, Sarah Irvin & Eduardo D. Espiridion, *Acute Psychosis Following 1,1-Difluoroethane Inhalation*, 11 CUREUS e5565, at 2 (2019).

[34] Erika L. Faircloth, Jose Soriano & Deep Phachu, *Inhalation of 1-1-difluoroethane: A Rare Cause of Pneumopericardium*, 10 CUREUS e3503, at 1 (2018).

[35] Mohan Punja, Dennis Bradley Langston & Maurice Walter Smith, *Cryogenic Dermal Injuries to the Chest Secondary to Inhalational Abuse of Keyboard Cleaner*, 56 CLINICAL TOXICOL. 672, 672 (2018).

| |
|---|
| Inhaled DFE accumulates in high levels in the brain, causing euphoria, intoxication, and confusion.[36] |
| Dust Off [sic] contains 1,1-difluoroethane, a halogenated hydrocarbon that works similarly to other abused inhalant products. Inhalation avoids hepatic first-pass metabolism, and as a result generates high CNS concentrations and rapid onset of intoxication: euphoria, disinhibition, confusion, and in some cases obtundation.[37] |
| Like other volatile hydrocarbons, difluoroethane is lipophilic and quickly crosses the blood-brain barrier with immediate CNS effects. Peak blood concentrations occur 10-20 seconds after inhalation. The euphoric high that results from inhaling or "huffing" difluoroethane can last for 15-30 minutes. Clinical presentation varies and depends on dose and exposure time[38]. |
| As a halogenated hydrocarbon, 1,1-difluoroethane is well absorbed via the lung, and rapidly distributed to organs with high fat content such as brain. Due to its high blood gas partition coefficient, the onset of effects with inhalation of this substance can be as rapid as an intravenous injection although the peak effects may be delayed because of slower tissue diffusion."[39] |
| Inhalation of volatile hydrocarbons rapidly distributes them throughout the body, producing a quick "high" within seconds to minutes.[40] |
| The majority of hydrocarbons started their therapeutic use as anesthetics. The mechanism of action associated with the euphoria and disinhibition associated with hydrocarbon abuse is thought to involve N-methyl-d-asparate (NMDA) antagonism and/or gamma aminobutyric acid (GABA) stimulation. 2 The NMDA receptor type that appears to be the most sensitive to |

[36] Eric Cohen et al., *Rapid-Onset Diffuse Skeletal Fluorosis from Inhalant Abuse: A Case Report*, 4 JBJS CASE CONNECT e108, at 4 (2014).

[37] Kristen Calhoun et al., *Inhaling Difluoroethane Computer Cleaner Resulting in Acute Kidney Injury and Chronic Kidney Disease*, 2018 CASE REPORTS IN NEPHROLOGY 4627890 (2018).

[38] C. Clinton Frazee et al., *Two Fatalities Involving 1,1-difluoroethane*, TOXICOLOGY CASES FOR THE CLINICAL AND FORENSIC LABORATORY 401, 402 (Hema Ketha & Uttam Garg, eds., 2020), available at https://linkinghub.elsevier.com/retrieve/pii/B9780128158463000806 (last visited Apr 25, 2021).

[39] Zhenggang Xiong, Joseph Avella & Charles V. Wetli, *Sudden Death Caused by 1,1-difluoroethane Inhalation*, 49 J. FORENSIC SCI. 627 (2004).

[40] H. Evan Dingle & Saralyn R. Williams, *Multi-Organ System Injury from Inhalant Abuse*, 23 PREHOSPITAL EMERGENCY CARE 580, 581 (2019).

solvents is also the most prevalent form in the brain during adolescence."[41]

73.     Regarding the second element, "compulsive use" refers to a pattern of consumption that is stimulus-bound (*i.e.*, the person is seeking a reward), stereotyped (*i.e.*, repeated acts over time), and difficult to control.[42] "Harmful consequences" refers to disruptions in primary role functions in life (*e.g.*, relationships, employment, education) and negative impacts on a person's physical, mental, or emotional health.

74.     Real world case reports shows that DFE's impact on the brain leads to compulsive use with harmful consequences:

| **Narratives from Published Case Studies of Compulsive Behaviors Related to Huffing** |
|---|
| Inhalation of 16 cans of Dust-off [sic] in a single episode, including daily use for a few weeks[43] |
| Medical visit preceded by inhalation of 10 cans of Dust-off [sic] in a single episode[44] |
| Patient reported abusing a computer dust removal product "Dust Off" [sic] daily for the past 2 years. On day of presentation, he inhaled 10 cans[45] |
| Patient suffered a relapse and used 8 cans of Dust-Off® per day for 2 weeks[46] |
| |

---

[41] Kathryn T. Kopec et al., *ACMT Toxicology Visual Pearls: I'll Huff and I'll Puff…*, ALiEM (2020), https://www.aliem.com/huffing/.

[42] S. T. Tiffany and B. L. Carter, *Is Craving the Source of Compulsive Drug Use?*, J. PSYCHOPHARMACOLOGY (Oxford, England), Vol. 12(1), 23-30 (1998). https://doi.org/10.1177/026988119801200104

[43] A Sidlak et al., *Severe cardiotoxicity and hypocalcemia from chronic inhalation of 1,1-difluorethane*, 57 CLINICAL TOXICOL. 1036 (2019).

[44] M. Patel et al., *Pneumomediastinum, acute kidney injury, rhabdomyolysis, and cryogenic dermal injuries secondary to inhalation abuse of keyboard cleaner*, 15 J. MED. TOXICOL. 78 (2019).

[45] K. Orjuela & V. Patil, *Duster abuse: A recurrent spell*, 14 EPILEPSY CURRENTS 164–165 (2014).

[46] I. Honkanen et al., *An unlikely source of periostitis*, 33 J. GENERAL INTERNAL MEDICINE 464 (2018).

| |
|---|
| Patient started to inhale this product 8 times daily for 7 years[47] |
| Patient self-reported a 6-month history of inhaling 20-25 cans of DFE per day[48] |
| Patient was inhaling DFE every day, going through multiple 300 mL cans daily[49] |
| Patient reported abusing 9 to 11 cans daily for the previous 11 months[50] |
| Patient had been huffing up to 10 canisters daily for a period of 9 months[51] |
| Patient stated that the last thing he remembered was "huffing" 6-10 cans of the computer cleaning product, Dust-Off[52] |
| Patient admitted to an "inhalational binge" with at least 6 cans of this product over the past 3 days[53] |
| He admitted to huffing 2-7 cans of air dust cleaner on a weekly basis for 3 years[54] |

75.     The incidents described in each of these studies all occurred after Defendant and the other manufacturers introduced the bitterant DB into their computer dusters. Addition of a bitterant is discussed in Section E, *infra*.

---

[47] A.K. Gupta & G.M. Chan, *Chronic Difluoroethane Abuse Associated Peripheral Neuropathy Treated Successfully with Gabapentin*, 47 CLINICAL TOXICOL. 715 (2009).

[48] Adam Custer et al., *Difluoroethane Inhalant Abuse, Skeletal Fluorosis, and Withdrawal*, 37 FED'L PRACTITIONER 288, 288 (2020).

[49] Shiliang A Cao, Madhab Ray & Nikolai Klebanov, *Air Duster Inhalant Abuse Causing Non-ST Elevation Myocardial Infarction*, 12 CUREUS e8402, at 2 (2020).

[50] Alex Ponce, Jennifer A. Oakes & William Eggleston, *Acute skeletal fluorosis in the setting of 1,1-difluoroethane abuse*, 57 CLINICAL TOXICOL. 374, 374 (2019).

[51] Regina Liu & Thomas Blair, *Skeletal Fluorosis and "Sniffer's Dermatitis" After Inhalant Abuse with 1,1-Difluoroethane*, 23 PROCEEDINGS OF UCLA HEALTH (2019).

[52] Erika L. Faircloth, Jose Soriano & Deep Phachu, *Inhalation of 1-1-difluoroethane: A Rare Cause of Pneumopericardium*, 10 CUREUS e3503, at 2 (2018).

[53] Mohan Punja et al., *Cryogenic dermal injuries to the chest secondary to inhalational abuse of keyboard cleaner*, 56 CLINICAL TOXICOL. 672, 672 (2017).

[54] Katherine Peicher & Naim M. Maalouf, *Skeletal Fluorosis Due to Fluorocarbon Inhalation from an Air Dust Cleaner*, 101 CALCIFIED TISSUE INT'L 545, 545 (2017).

76.     As demonstrated by these medical reports and studies, compulsive behavior of inhaling DFE persisted despite very harmful consequences. Specifically, in addition to death from cardiac arrest or Sudden Sniffing Death Syndrome, the following medical conditions have been directly attributed to huffing DFE: (1) skeletal fluorosis/bone deformities; (2) bone fractures from falls; (3) motor vehicle crashes; (4) chemical burns, blisters and rashes; (5) dysrhythmia; (6) toxic myopericarditis; (7) ventricular fibrillation, tachycardia and other cardiac dysfunction; (8) acute kidney injury and failure; (9) pneumomediastinum; (10) dyspnea; (11) seizures; (12) loss of motor control; and (13) psychosis.[55]

77.     The non-profit organization Families United Against Inhalant Abuse ("Families United") also tracks and reports the various harmful effects of huffing DFE. Families United reports that, aside from causing death, huffing can lead to permanent brain damage, hearing loss, loss of smell, irregular heartbeat, liver damage, kidney damage, and bone marrow depression, as depicted on the following graphic.[56]

---

[55] Clara B. Novotny, Sarah Irvin & Eduardo D. Espiridion, *Acute Psychosis Following 1,1-Difluoroethane Inhalation*, 11 CUREUS e5565 (2019).

[56] https://familiesunitedagainstinhalantabuse.org/our-story/effects-of-inhalant-abuse/



78.     Moreover, recent research shows that huffing DFE can lead to withdrawal psychosis.[57] Other studies have demonstrated that 47.8% of persons who met the criteria for inhalant dependence reported experiencing three or more inhalant-related withdrawal symptoms which were "clinically significant," a percentage nearly equivalent to the percentage of persons

___

[57] Adam Custer, et al., *Difluoroethane Inhalant Abuse, Skeletal Fluorosis, and Withdrawal, supra*, at 288-289.

with cocaine dependence who reported clinically significant cocaine withdrawal symptoms.[58] This data indicates that DFE is highly addictive.

79.     The addictive nature of huffing DFE, combined with the risks it poses creates a scenario similar to Russian Roulette every time a user inhales DFE. Cardiac arrest or Sudden Sniffing Death can occur the first time a duster is inhaled and lead to immediate death.[59] Non-fatal yet permanent damage to various organs, including permanent brain damage, can also occur as described above.[60]

**D.     The numbers of deaths attributed to huffing are significant and rising**

80.     The National Inhalant Prevention Coalition ("NIPC") reports that the number of inhalant-related deaths in the United States is approximately 100-125 people per year.[61] However, this number is incorrect and far below the actual number of deaths. As the executive director for the Alliance for Consumer Education—the industry trade group—explained in a newspaper, inhalant-related deaths are underreported because many are recorded as something else.[62] Other researchers concur.

81.     Families United also tracks death statistics attributed to DFE inhalation. Their report is grim. In Virginia, Florida, Los Angeles and San Diego Counties in California, 17 counties

---

[58] Brian E. Perron, et al, *The prevalence and clinical significance of inhalant withdrawal symptoms among a national sample*, 2 SUBSTANCE ABUSE AND REHABILITATION 69-76 (2011).

[59] M. Bass, *Sudden Sniffing Death*, 212 JAMA 2075–2079 (1970). *See also* A. Groppi et al., *A Fatal Case of Trichlorofluoromethane (Freon 11) Poisoning. Tissue Distribution Study by Gas Chromatography-Mass Spectrometry*, 39 J. FORENSIC SCI. 871, 871–876 (1994); Xiong, *supra*, at 627–629; J. Avella, et al., *Fatal cardiac arrhythmia after repeated exposure to 1,1-difluoroethane (DFE)*, 27 AM. J. FORENSIC MED. PATHOL. 58–60 (2006).

[60] https://familiesunitedagainstinhalantabuse.org/our-story/effects-of-inhalant-abuse/.

[61] https://www.nationaltasc.org/determine-death

[62] Carter Sherman, Inhalants – *The Easy to Acquire but Deadly Drug That Nobody Talks About*, HOUSTON PRESS, Sept. 6, 2016.

in Pennsylvania, and Travis County, Texas alone, they found a total of 1,109 inhalant deaths from 2007 through 2019. Of these figures, an eye-popping *648 deaths* were attributed to DFE intoxication.[63]

82.     Perhaps the most compelling statistics on deaths attributed to DFE is from a clearinghouse maintained by the CPSC known as the Consumer Product Safety Risk Management System ("CPSRMS"), which is separate and distinct from NEISS. Between 2006 and 2022, CPSC received reports for 1,210 unique incidents involving inhalation hazards from aerosol dusters (of which 99.3% or 1,201 were fatal), and separately, 1,115 unique fatal incidents involving DFE toxicity (where dusters were not specifically mentioned, but were most likely the culprit). If all the remaining 1,115 DFE-related deaths can be attributed to dusters (which is likely based on anecdotal evidence referenced), this would amount to 2,324 aerosol duster incidents (including 2,316 fatalities) reported in CPSRMS.[64]

83.     The problem is getting worse. Over 80% of the duster inhalation incidents in CPSRMS occurred between 2013 and 2022. Similarly, 84% of the deaths attributed to DFE toxicity in CPSRMS occurred between 2013 and 2022.[65]

84.     The clearinghouse data reflects deaths in every state in the U.S., plus the District of Columbia and other U.S. territories. The CPSC data comes from death certificates and medical examiner and coroner reports, among other reliable sources. The states with the most aerosol duster inhalation incidents were Florida, Texas, California, Georgia, and Illinois. The states from which

---

[63] https://familiesunitedagainstinhalantabuse.org/inhalent-deaths-in-us/

[64] U.S. CONSUMER PRODUCT SAFETY COMMISSION, STAFF BRIEFING PACKAGE – AEROSOL DUSTER PETITION, July 26, 2023, at 14-17, https://www.cpsc.gov/s3fs-public/Petition-Requesting-Rulemaking-to-Establish-Safety-Standard-for-Aerosol-Duster-Products-Petition-CP-21-1.pdf?VersionId=.NohA6DG6WsXh_tsjhGuA7RuqMCOvxSW

[65] *Id*. at 15, fig. 2.

the most DFE-related death reports were received were Florida, Ohio, Pennsylvania, <u>Illinois</u>, and North Carolina. States with the most CPSRMS reports related to this analysis were Florida (222), Texas (121), <u>Illinois (115),</u> Ohio (105), Pennsylvania (105), and North Carolina (105). Upon information and belief, these numbers represent only the tip of the iceberg.[66]



85.     These figures undercount deaths for several reasons. First, there is a lag time between date of death and reporting to the CPSC.[67] Secondly, the tests for DFE are not part of the typical battery of tests performed during an autopsy. Acute 1,1-Difluoroethane intoxication is determined using a volatile test, which evaluates toxicity of the decedent's blood. A femoral blood sample is submitted to a reference laboratory for 1,1-Difluoroethane using a gas chromatograph/mass spectrometer. But volatile testing for DFE is not part of the typical autopsy

---

[66] *Id*. at 16-17, fig. 3.

[67] *Id*. at 16.

battery of tests. A case study co-authored by doctors at Children's Mercy Hospital, University of Missouri School of Medicine, and the Office of Jackson County Medical Examiner, all in Kansas City, Missouri, involving two deaths attributed to 1,1-Difluoroethane illustrates this problem. The authors write: "DFE is not typically included in routine postmortem toxicology screens and could be overlooked without appropriate scene investigation, case history and/or anatomical pathology findings."[68] This study and others like it have advocated for medical examiners to include volatile tests as part of routine autopsy screens to properly identify DFE-related deaths.

86.     Aside from delay in reporting and undercounting DFE-related deaths during autopsies, there are also numerous bystanders killed each year as a direct result of DFE abuse. Many of these bystanders are killed by vehicles operated by individuals driving under the influence of DFE. Yet, their deaths are not always attributed to DFE abuse.

**E.     The CPSC has voted to initiate rulemaking concerning DFE-based dusters**

87.     On August 2, 2023, the CPSC voted 3-1 to grant a petition to initiate rulemaking "to adopt a mandatory safety standard to address the safety hazards associated with intentional inhalation of fumes from aerosol duster products" containing DFE.[69] Commissioner Trumpka issued a statement in support of this action noting the abuse of duster cans "is a nationwide problem" and "one of the most abused substances among high school students" – the "social cost of injuries and deaths from aerosol duster abuse stands at over $1 billion per year."[70]

---

[68] Frazee, *supra*, at fn. 38.

[69] *See* U.S. CONSUMER PRODUCT SAFETY COMMISSION, RECORD OF COMMISSION ACTION, August 2, 2023. https://www.cpsc.gov/s3fs-public/RCAPetitionRequestingRulemakingtoEstablishSafetyStandardforAerosolDusterProductsPetitionCP21_1.pdf?VersionId=nQcgEM4wvCJE97zmhwYCdAkwuluYerIt. Families United was the petitioner in this matter.

[70] *Id.*

88.     When broken down per can sold, the societal cost of the aerosol duster epidemic exceeds $50 per can. And this figure excludes property damages and injuries or fatalities of bystanders injured due to huffing. Clearly the risk presented by aerosol dusters outweighs any plausible utility.

**F.     Endust and its competitors – content of the duster cans and subsequent addition of bitterant due to foreseeable use as an inhalant.**

89.     During all times relevant to this case, Defendant Norazza designed, tested, labeled, marketed, and distributed Endust for sale across the United States, including in the State of Illinois and each of the other 49 states and territories.

90.     Norazza was responsible for designing, manufacturing, testing, labeling, marketing, and distributing the can of Endust that killed Tim Piatek.

91.     Defendant contracts with big box retailers across the United States and in the Chicago, Illinois, metropolitan area (which encompasses Cook County) to stock and sell Endust and private label versions of Endust to consumers, many of whom purchase these products in multiple quantities and on a repeated basis to huff. To maximize profit, Defendant offered its dusters for sale in multi-packs of up to 12 or more cans for as little as $1.89 per can. A single can is capable of delivering up to 100 "hits" of DFE, making it among the cheapest and most readily available drugs.

92.     Upon information and belief, Defendant encourages resellers to market their computer dusters on endcaps and near check out areas with prominent signage.

93.     Per the Safety Data Sheet, revision dated May 2015, Endust is comprised 100% of 1,1-Difluoroethane. This version of Endust's Safety Data Sheet was available on Office Depot's website.

Page 1/10

## Safety Data Sheet
according to 1907/2006/EC (REACH), 1272/2008/EC (CLP), and GHS

Revision: 05.2015

### 1 Identification of the substance/mixture and of the company/undertaking

· **1.1 Product identifier: 11407**

· **Trade name: Endust® For Electronics 10Oz**

· **Article number:** 11407 (2 x 10oz)
· **CAS Number:**
  75-37-6
· **EC number:**
  200-866-1
· **1.2 Relevant identified uses of the substance or mixture and uses advised against**
  No further relevant information available.

· **Application of the substance / the mixture** Surface cleaning

· **1.3 Details of the supplier of the Safety Data Sheet**
· **Manufacturer/Supplier:**
  Norazza, Inc.
  3938 Broadway St
  Buffalo, NY 14227
  Phone: (716) 706-1160
  Website: www.norazza.com

· **1.4 Emergency telephone number:**
  ChemTel Inc.
  (800)255-3924, +01 (813)248-0585

### 3 Composition/information on ingredients

· **3.1 Substances**
· **CAS No. Description**
  75-37-6 1,1-difluoroethane

(Contd. on page 3)

94.     While this Safety Data Sheet claims the content is 100% DFE, Endust cans also contain a trace amount of bitterant. Upon information and belief, the bitterant is only around .01% of each can.

95.     Norazza also places a warranty on the back of their dusters. Norazza cans warrant: "Safety bitterant included to help discourage inhalant abuse." A picture of the warranty is set forth in Section I. Introduction, *supra*.

34

96.     Numerous cases have been filed against Defendant and its retail partners, including Walmart, alleging wrongful death, products liability and related claims arising from inhalation of DFE.

97.     In one such case, *Michael Grieco et al. v. Amy Merrill et al.*, Walmart's corporate representative Joe Bussell testified that incidents of huffing dating back to 2008 led Walmart to request a bittering agent be added to all computer duster products (in 2008, a different company manufactured private-labeled Surf onn. for Walmart, but Norazza is now the manufacturer and uses the same formulation).[71]

```
 8   Q.     Well, the cover page for the article is dated July
 9   31st, 2008; right?
10   A.     (Witness nods head.)
11   Q.     So Walmart was aware people were actually huffing in
12   their stores and passing out in 2008; right?
13   A.     Yes.  Again, those types of incidents are what led
14   us to request that there was a bittering agent in the
15   products.
```

98.     In 2011, Walmart required that a bitterant be incorporated into its store brand and other dusters before they could be sold at Walmart stores. Yet, even with addition of a bitterant, huffing continued to be a problem. Indeed, Walmart was later notified that the bittering agent was ineffective.[72]

---

[71] Joe Bussell Dep. 148:8-15, Oct. 22, 2015, *Michael Grieco et al. v. Amy Merrill et al.*, Case No. 502012CA021342 (Fla. 15th Cir. Ct.).

[72] *Id*. at 53:6-55:1.

35

6   Q.   (Mr. Cornwell continued.) Well, it wa    lear

7  and foreseeable to Walmart that its customers, many of

8  them, buy this product to inhale it and get high in 2012.

9              MR. SANTIAGO:  Object to the form.

10             MR. WOOD:  Move    ike.

11   A.   Again, Walmart was awa       people bought this

12  type of product and were   ing it or misusing it. And

13  because of that, that&apos;   Walmart moved to purchase only

14  those products with the bitterant.  There's also warning

15  labels and quite a few things on the product that state

16  that people should not do that.

17   Q.   (Mr. Cornwell continued.) Walmart, in fact, in 2012

18  was aware of an allegation by one of its former suppliers

19  that Ultra Duster and the bitterant in it were in --

20      that.

21      In 2012, when my clients were injured by a customer

22  of Walmart who had been inhaling Ultra Duster, Walmart was

23  aware that one of its former suppliers contended the

24  bitterant in Ultra Duster was ineffective; correct?

1   A.   Walmart had received a -- a notice from a competitor

2  of this particular product supplier stating that, yes.

3   Q.   (Mr. Cornwell continued.) Walmart was also aware of

4  hundreds of incidents involving individuals inhaling Ultra

5  Duster on store property, in the store parking lot,

6  driving vehicles, crashing cars, killing themselves, and

7  killing others, in 2012, wasn't it?

8             MR. WOOD:  Same objection.

9   A.   Again, I don't know the specific nature of the

10  complaints. Walmart was aware that there were incidents

11  involving people inhaling this product, and that's why

12  Walmart engaged with the suppliers to determine what sort

13  of action could be taken to deter that type of activity.

14   Q.   (Mr. Cornwell continued.) Do you know when Walmart

15  required its canned air suppliers to incorporate a

16  bitterant in the product?

17   A.   I believe it was 2011.

22    A.    As I mentioned earlier, we don't know the specific
23    make up of -- or chemical composition of the products, but
24    we know that in 2011 is when we had conversations with our
25    suppliers and began to require that we purchased only

JOE BUSSELL - October 22, 2015                          55

1    canned air that contained a bittering agent.

99.    Defendant Norazza followed suit and added a bitterant in order to continue to sell its computer dusters at Walmart and at other retailers.

100.    Falcon Safety Products, Inc., another manufacturer of dusters, issued a press release in 2006 entitled "New Dust-Off (™) Formula Deters Inhalant Misuse."[73] This formula was based on the joint research and development between Falcon Safety Products and DuPont, which was subsequently patented in 2010.[74]

101.    According to the original patent:

> [T]hese duster products provide a safe and valuable function to the consumer, but sometimes are involved in inhalation misuse incidents… One such approach [to deter intentional inhalation of dust removers] is to incorporate a denaturant in the aerosol duster than can be detected in an abuse scenario, but undetectable when duster products are used as recommended.[75]

---

[73] https://www.prweb.com/releases/2006/10/prweb461265.htm.

[74] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en.

[75] *Id.*

102.     Greg Mas, one of the authors of the patent and the current Chief Financial Officer of Falcon Safety Products, gave testimony in another personal injury case involving computer duster huffing. Mas was asked about the quantity of DB added to each can of Dust-Off. Mas testified that the target range for the DB was "5 to 50 ppm [parts per million]."[76]

---

[76] Gregory Mas Dep. 10:2-25 (June 18, 2019), *Shannon Cheney v. Stephen Willson et al.*, Case No. 502013CA007140 (Fla. 15th Cir. Ct.).

2      Q      And do you recall what the target amount of
3      bittering agent was for cans of Falcon Safety Products
4      dusters that were being manufactured and sold by them?
5      A      We wanted -- I think we covered this in the
6      last deposition, but we wanted to be within the range,
7      the defined range of the IP which is 5 to 50 PPM and we
8      tried to get it close to 10 PPM initially, as we talked
9      about in the last deposition.
10     Q      And how did you go about, as you put it,
11     trying to get it close to 10 parts per million?
12     A      Based on our doser. We're using an EFD doser
13     that's incredibly accurate using pharmacies -- not
14     pharmacies -- pharmaceuticals and medical labs.
15     Q      And so the goal was to inject in each can an
16     amount of bittering agent that when expressed as a
17     percentage of the contents of the entire can, the
18     bittering agent would constitute approximately 10 parts
19     per million; is that correct?
20     A      That was roughly what we wanted it to be.
21     Q      When you say roughly, was there a range that
22     you sought to achieve?
23     A      No, but it wasn't a perfect science, but we
24     were -- we were very close. Anything inside the 5 to 50
25     PPM was what we were targeting.

103.     The increasing problem of huffing as shown by the various public databases and
surveys – which notably continued to increase rapidly after addition of the bitterant – indicates
that the bitterant was ineffective as a deterrent.

104.     Norazza follows the same patent.

**G.     DB is ineffective at deterring huffing and may increase the risks of huffing**

1.      **DB — A bitter denaturant used to prevent accidental poisoning**

105.    Denatonium benzoate, known as DB, is an alcohol denaturant which has been heavily promoted for inclusion in household products, gardening products, and cosmetics to purportedly prevent accidental ingestion by children.[77]

106.    According to the Guinness Book of World Records, DB (also known by its tradename "Bitrex") is "the most bitter substance in the world." Despite being the most bitter substance, the manufacturer of Bitrex openly advertises that the bitter taste can be easily averted with a sugary substance, like chocolate.



---

[77] https://www.sciencedirect.com/topics/medicine-and-dentistry/denatonium-benzoate

107.    DB has a modest effect on deterring accidental ingestions. For example, in a 1991 study, authors Sibert and Frude examined DB as a deterrent among 33 children aged 17-36 months. The children were provided orange juice containing 10 ppm of DB. 30 children took a drink of orange juice with DB. Among those 30 children, nearly one-fourth of the children proceeded to drink after the initial exposure.[78] Notably, the concentration of DB in this study was more than 25 times the concentration expected in the vapor phase of computer dusters.

108.    Per the 2008 Cosmetic Ingredient Review Expert Panel, DB has the following perceptual characteristics:

| Perceptual characteristics in measurement terms parts per million or parts per billion |
| --- |
| DB is *detectable* at .01 ppm (10 ppb) |
| DB is *recognizably* bitter at .05 ppm (50 ppb) |
| DB is *unpleasantly* bitter at 10 ppm (10,000 ppb) |
| DB is *aversively* bitter at 20-50 ppm (20,000-50,000 ppb)[79] |

**2.    DB has not been added at the necessary concentration to deter abuse**

109.    Detection and recognition are critical concepts related to the theory of bitterants as deterrents to inhalant huffing. Keast and Roper, in a 2007 article, defined these concepts as follows:

> [A] chemical may be in a solution at a concentration that the sample population could not detect. As a concentration of the chemical increases, a detection threshold will be reached, the level at which the chemical in solution may be discriminated from water. As the concentration of the chemical increases further, the recognition threshold is reached, the point at which the quality (e.g. bitter) can be identified. As concentration of the chemical increases still further, the intensity of the bitterness mutually

---

[78] J. R. Sibert & N. Frude, *Bittering agents in the prevention of accidental poisoning: children's reactions to denatonium benzoate (Bitrex)*, 8 ARCHIVES OF EMERGENCY MEDICINE 1, 1 (1991).

[79] Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate. INTERNATIONAL JOURNAL OF TOXICOLOGY, 27 Suppl 1, at 4. https://doi.org/10.1080/10915810802032388

increases to a theoretical asymptote were concentrate increases no longer cause subsequent increases in intensity.[80]

110.     The following graphic illustrates these concepts:



111.     As this graphic shows, aversely bitter is the threshold level of a true deterrent. The level of DB which is added to dusters per the DuPont patent is 5-50 ppm, which should fall within the range of being unpleasantly bitter to adversely bitter.[81] Yet, the data shows that huffing continues to increase. So, where is the disconnect? The science of addiction and the chemical properties of DB provide foreseeable reasons why it is ineffective in DFE duster products.

**3.     Differences between accidental ingestion and intentional ingestion have been ignored.**

112.     While accidental ingestion by children is often the result of normal exploratory behavior, huffing DFE is a fundamentally different proposition. Specifically, the underlying motivation is completely different.

113.     A 2010 study authored by Bromberg-Martin et al. observed:

---

[80] Russell S. J. Keast & Jessica Roper, *A Complex Relationship Among Chemical Concentration, Detection Threshold, and Suprathreshold Intensity of Bitter Compounds,* 32 CHEMICAL SENSES 245, 245 (2007).

[81] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en

> We seek rewards and assign them a positive value, while we avoid aversive
> events and assign them a negative value. In other respects we treat rewarding
> and aversive events in similar manners, reflecting their similar motivational
> salience. Both rewarding and aversive events trigger orienting of attention,
> cognitive processing, and increases in general motivation.[82]

114.    While an unpleasant taste can plausibly disrupt accidental ingestion, whether DB

produces a taste so disgusting that avoiding the aversive state (*i.e.*, unpleasant bitter taste) is more

desirable than achieving the rewarding state (*i.e.*, euphoria or intoxication) must be considered.

The patent Norazza follows fails to mention this consideration.[83]

115.    According to the original patent, people would be deterred from inhalant use if they

simply "detected" DB in a huffing scenario.[84] However, to achieve a true deterrent effect, the

concentration of DB must be at a level to make the experience sufficiently noxious or disgusting.

While this may be true related to accidental ingestion, research suggests that inhalant huffing is

entirely different. For example, if a person is motivated to get drunk, an unpleasant taste may not

deter them from drinking alcohol. Similarly, exposing someone to the lowest possible

concentration of DB that can be detected or recognized will likely not affect a goal-seeking

behavior (*i.e.*, the intent to get high).

116.    Per the DuPont patent, DB is added in solid form to the can of liquid DFE aerosol.

DB dissolves within the can by addition of a solvent. The can is pressurized and the liquids are

---

[82] E.S. Bromberg-Martin, M. Matsumoto, and O. Hikosaka, *Dopamine in motivational control: Rewarding, aversive, and altering*, 68 NEURON 815, 815-834 (2010).

[83] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en.

[84] *Id.*

expressed in a gas vapor.[85] There is no evidence to suggest that DB's detection levels, recognition, and aversiveness in a concentrated vapor spray are equivalent to a liquid.

117.    Indeed, Stephen Willson, an individual who huffed DFE duster products and subsequently hit the plaintiff in the *Cheney v. Willson* case while driving under the influence, testified regarding the taste of bitterant in Dust-Off, another brand identical in composition to Endust. Willson could identify the bitterant taste but described it as not "overwhelming" and compared it to the taste of vodka.[86]

---

[85] *Id.*

[86] Stephen Willson Dep., 58:1-18 (June 10, 2014), *Shannon Cheney v. Stephen Willson et al*, Case No. 502013CA007140 (Fla. 15th Cir. Ct.).

```
 2     A.   It had a taste, but it wasn't an overwhelming --
 3    it wasn't pleasant, but it wasn't overwhelming.
 4          Q.   So if I understand -- I want to make sure I heard
 5    correctly.   You said it was not a pleasant taste?
 6          A.   Uh-huh.
 7          Q.   Is that correct?
 8          A.   Yes.
 9          Q.   Okay.   I'm just trying to make sure the record is
10    clear.   That's why I was asking --
11          A.   Okay.   Yeah.
12          Q.   And despite this unpleasant taste, was it your
13    desire to -- to get high that made you overcome this --
14    this unpleasant taste or --
15          A.   Not un --
16          Q.   -- suffer through it?
17          A.   Not unlike vodka, which isn't particularly
18    pleasant, either.   Yes.
```

118.     Willson's testimony indicates that the concentration of DB in the gas vapor phase is significantly less than the 5-50 ppm range which is contemplated by the DuPont patent. Willson describes his detection level as being in the .01-.05 ppm range and certainly below the level of being aversely bitter.

119.     Researchers have noted that addition of the bitterant to computer dusters does not appear to deter huffing. Specifically, a study published in the Journal of American Toxicology

notes: "Companies that manufacture [dusters] are aware of [inhalant abuse] and add a bittering agent to deter abuse, but it is unknown whether this reduces the prevalence or not."[87]

### 4. Other considerations make DB an improper bitterant in this application

120.     Even if DB has a deterrent effect—which the evidence indicates it does not—its impact has limited effect among the broader population of inhalant users. A CPSC report on aversive agents states:

> The ability to detect the bitter taste of certain propylthiourea derivatives is a genetic trait. Between **15-30%** of ***the adult population are unable to detect the bitter taste of this class of compounds***. Psychological studies have shown that non tasters may also be unable to detect other bitter molecules, ***including saccharin and denatonium benzoate***.[88]

121.     In addition, there are serious potential harmful effects of DB as a bitterant. A letter to the journal Forensic Toxicology authored by Perron, et al. (2010) stated that certain individuals are at increased risk when inhaling DB-containing DFE due to DB being a bronchodilator. Specifically, they state:

> The absorption of DFE and similar volatile anesthetics is rapid and minimally influenced by bronchial airway tone, but the potent relaxation induced by DB may impact the way DFE behaves in the body. While DB-induced bronchial relaxation may not overly impact most individuals who inhale DB-containing DFE products, there is a potential risk that those with symptomatic asthma or other bronchoconstrictive disease may experience increased effects from DFE when inhaled with DB.

---

[87] Chris Vance, et al, *Deaths Involving 1,1-Difluoroethane at the San Diego County Medical Examiner's Office*, 39 J. ANAL. TOXICOL. 626, 626-633 (Nov./Dec. 2012), https://academic.oup.com/jat/article/36/9/626/784617

[88] *See* U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS 18 (1992) (emphasis added). *See also* Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate, *supra*.

122.     Moreover, the rapid effects of DFE simply make it unlikely that a person under the influence will be thinking about an unpleasant bitter taste in the same way that a sober individual would.

123.     Even if DB had the potential to deter huffing, the levels at which it is added to Endust computer dusters have foreseeably failed to deter such use. Thus, huffing continues to occur and Tim Piatek is one of thousands of victims.

**H.     Independent tests show that DB is not present in the quantity Norazza represents or at the threshold level of detectability to most human subjects**

124.     An independent test of three 12 oz. cans of Endust, Ultra Duster, Dust Off, and Surf onn. was recently conducted by Research Triangle Park Laboratories, Inc. Specifically, the lab used a validated testing method to expel and measure the contents of each can. Cans were weighed before and after each phase of testing. The testing method mimicked an individual putting the can straw into their mouth and inhaling the product.

125.     The lab utilized a capture apparatus that collected gas in a Tedlar sampling bag, a bag designed by DuPont and validated by the Environmental Protection Agency as appropriate for testing products in the gas phase.

126.     The results were shocking: zero DB was present in the gas phase of the Endust cans. The test also showed wild fluctuations in the amount of DB inside the cans. (The other duster brands had similar results.)

|  | Ultra Duster | Dust Off | Endust | surf onn |
|---|---|---|---|---|
| **DB in Gas Phase (ppbv)** | 3.38 | 0.00 | 0.00 | 0.00 |
| **Total DB in Can (ppm)** | 0.019 | 0.001 | 62.869 | 10.432 |





127.    This amount of DB is less than the recognized level at which a bitterant would be detectable to humans according to testing sponsored by the Consumer Product Safety Commission and presented by the Cosmetic Ingredient Review Expert Panel.[89]

---

[89] *Id.*

| Perceptual characteristics in measurement terms parts per million or parts per billion |
|---|
| DB is *detectable* at .01 ppm (10 ppb) |
| DB is *recognizably* bitter at .05 ppm (50 ppb) |
| DB is *unpleasantly* bitter at 10 ppm (10,000 ppb) |
| DB is *aversively* bitter at 20-50 ppm (20,000-50,000 ppb)[90] |

128.    This testing coupled with the foregoing test data and the testimony from Norazza's private label partner Walmart shows that Norazza knew or should have known that the bitterant they represented would help deter inhalant abuse neither discourages nor deters the foreseeable use of huffing because DB is not present in a sufficient quantity.

129.    Norazza failed to adequately test to determine if the bitterant they advertise as a deterrent was added in a proper manner to perform as warranted, specifically to "discourage inhalant abuse." Or worse, Defendant intentionally failed to add the proper amount of bitterant to cut costs and increase its own profits.

130.    Upon their own admission set forth in their warranty on each can, Norazza undertook a duty to improve the safety of Endust by adding bitterant to deter inhalant abuse. Norazza was also aware that, absent a bitterant, Endust presented an unreasonable risk of harm to consumers.

131.    Norazza knew or should have known that the formulation in which the bitterant is added does not deter abuse and, thus, rendered Endust defective. Yet, Norazza continued to design, manufacture, label, market and distribute Endust in a defective manner.

132.    Further, Norazza knew or should have known that huffing DFE is addictive and continues to lead to huffing-related injuries and death, yet intentionally failed to warn consumers

---

[90] *Id.*

such as Tim Piatek that foreseeable use of the product to huff could lead to inhalant addiction, inhalant abuse disorder, bone deformity and other injuries, and, ultimately, death.

133. Norazza labeled Endust in a manner which contains false claims, specifically "SAFETY BITTERANT ADDED to help discourage inhalant abuse." This statement constitutes a warranty which is false, as Defendant is aware that the bitterant is ineffective and fails to discourage inhalant abuse.

134. Defendant Norazza placed Endust and private label versions of Endust into the stream of commerce in a defective and unreasonably dangerous manner.

135. The bitterant put into these cans does not come out of the cans in a sufficient quantity to deter inhalation and huffing.

## V. CLASS ACTION ALLEGATIONS

136. Plaintiff seeks certification on behalf of a Rule 23(b)(3) Issue Class defined as follows (the "Illinois Issue Class"):

> All citizens of Illinois, and their heirs and survivors, who have (1) suffered or presently suffer injury or addiction; or (2) died from DFE intoxication (including acute 1,1-Difluroethane intoxication or equivalent post-mortem cause of death terminology), arising from inhaling computer duster manufactured by Norazza, Inc.

137. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as immediate family members; (b) Defendant and Defendant's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which Defendants or their parents have a controlling interest, as well as Defendant's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendant; and (f) the legal representatives, successors, and assigns of any such excluded persons.

138. Plaintiff reserves the right to modify or refine the definitions of the Class based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

139. Plaintiff seeks certification on behalf of a Rule 23(c)(4) class defined as above for particular issues including the following:

    a. whether Defendant's computer duster products were defectively designed;

    b. whether Defendant failed to warn users;

    c. whether Defendant negligently designed their computer duster products;

    d. whether Defendant negligently failed to warn users;

    e. whether Defendant knew or should have known that inhaling computer dusters was a foreseeable use of the product;

    f. whether Defendant knew or should have known that inhaling computer dusters could lead to addiction, inhalant abuse disorder, injury or death;

    g. whether Defendant knew or should have known that the bitterant it allegedly added to computer dusters was ineffective in its stated purpose of being a deterrent to inhalant huffing use;

    h. whether Defendant negligently warned by stating that "SAFETY BITTERANT ADDED to help discourage inhalant abuse" was included in its computer dusters;

    i. whether Defendant knew or should have known that the bitterant allegedly added to computer dusters was not capable of coming out of the can in sufficient quantity to prevent inhalation abuse and was ineffective in its stated purpose of being a deterrent to inhalant huffing use;

j. whether Defendant knew or should have known that a significant portion of consumers cannot detect the bitterant allegedly added to computer dusters;

k. whether Defendant knew or should have known that the bitterant allegedly added to computer dusters was a bronchodilator; and

l. whether Defendant knew or should have known that the bitterant allegedly added to computer dusters made huffing their products more dangerous.

140. Numerosity (Rule 23(a)(1)). The Class is so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class, as herein identified and described, is not known, but upon information and belief, thousands of individuals have suffered injuries or died because of DFE intoxication or DFE inhalation arising from DFE-based aerosol dusters.

141. Commonality (Rule 23 (a)(2)). Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

a. whether Defendant engaged in the conduct alleged herein;

b. whether Defendant knew or should have known that computer dusters posed health risks;

c. whether Defendant knew or should have known that computer dusters were frequently used by purchasers with the intent to get high;

d. whether Defendant knew or should have known that inhaling computer dusters was a foreseeable use of the product;

e. whether Defendant knew or should have known that inhaling computer dusters could lead to addiction, inhalant abuse disorder, injury or death;

f.  whether Defendant knew or should have known that the bitterant allegedly added to computer dusters was ineffective in its stated purpose of being a deterrent to inhalant use;

g.  whether Defendant knew or should have known that the bitterant it allegedly added to computer dusters was ineffective in its stated purpose of being a deterrent to inhalant huffing use;

h.  whether Defendant negligently warned by stating "SAFETY BITTERANT ADDED to help discourage inhalant abuse" on cans of computer dusters;

i.  whether Defendant knew or should have known that the bitterant allegedly added to computer dusters was not capable of coming out of the can in sufficient quantity to prevent inhalation abuse and was ineffective in its stated purpose of being a deterrent to inhalant huffing use;

j.  whether Defendant knew or should have known that a significant portion of consumers cannot detect the bitterant allegedly added to computer dusters;

k.  whether Defendant knew or should have known that the bitterant allegedly added to computer dusters was a bronchodilator;

l.  whether Defendant knew or should have known that the bitterant allegedly added to computer dusters made huffing their products more dangerous;

m.  whether Defendant wrongfully represented that the bitterant allegedly added to computer dusters could in fact be detected by inhalant abusers and, thus, operate to deter use;

n.  whether Defendant placed computer dusters into the stream of commerce in a defective and/or unreasonably dangerous manner;

o.  whether Defendant negligently designed computer dusters by adding DB as a bitterant and adding an insufficient quantity of bitterant;

p.  whether Defendant negligently manufactured computer dusters;

q.  whether Defendant negligently failed to warn that huffing DFE was extremely addictive which increased the risk of injury or death from huffing;

r.  whether Defendant negligently warned consumers by stating "SAFETY BITTERANT ADDED to help discourage inhalant abuse" on cans of computer dusters; and

s.  whether Plaintiff and members of the Class are entitled to actual, statutory, and punitive damages.

142.    Typicality (Rule 23(a)(3)). Plaintiff's claims are typical of the claims of the other members of the proposed Class. Plaintiff and members of the Class (as applicable) suffered injuries because of Defendant's wrongful conduct that is uniform across the Class.

143.    Adequacy (Rule 23(a)(4)). Plaintiff's interests are aligned with the Class she seeks to represent. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interest of the Class. Plaintiff has no interest that is antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class.

144.     Superiority. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and Defendant, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

145.     Manageability. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

146.     Class certification on the defined issues, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.  CLAIMS FOR RELIEF

### COUNT I: STRICT PRODUCTS LIABILITY – DESIGN DEFECT

147.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

148.     Plaintiff brings this claim for strict liability pursuant to the Restatement (Second) of Torts § 402A, which Illinois has adopted. *See Mikolajczyk v. Ford Motor Co.*, 231 Ill.2d 516, 555-56, 901 N.E.2d 329 (2008).

149.    Defendant Norazza is a manufacturer who produced, manufactured, designed, and assembled the products at issue in this case, which include Endust and its private label versions (collectively "computer dusters"), with an intent to place these products in the stream of commerce.

150.    At all times relevant herein, Defendant's computer dusters were in substantially the same condition as when they left Defendant's control.

151.    At all times relevant herein, Endust and its private label versions were not altered in any way since the time they left Defendant's control.

152.    At the time of their sale and/or use, Defendant's computer dusters possessed numerous design defects that rendered them unreasonably dangerous at the time the products left Defendant Norazza's control.

153.    The danger posed by Defendant Norazza's computer duster products went beyond that which would be contemplated by a consumer with ordinary knowledge common to the community as to its characteristics. Alternatively, the benefits of the design are outweighed by the design's inherent risk of danger.

154.    Defendant knew or should have known by reasonable care of the defects described in the factual allegations.

155.    For example, DFE is a highly addictive and dangerous chemical which is unfit to be sold in a consumer product. Each can of computer duster was comprised of 99.9% DFE, a dangerous refrigerant which is highly addictive and creates intense euphoria when inhaled or "huffed."

156.    The inclusion of DFE, a highly addictive substance, within computer dusters which are generally sold over-the-counter and can be obtained in bulk at big-box and small retailers

including local hardware, office supply, and grocery stores constitutes a design defect that renders the products unreasonably dangerous to individuals.

157.    DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates neurotransmitter GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control, and consciousness.[91]

158.    Based on publicly available data from verifiable sources such as the National Poison Data System (a data warehouse for the 55 poison control centers across the U.S.), the National Electronic Injury Surveillance System ("NEISS") (a database managed by the U.S. Consumer Product Safety Commission which catalogs injuries treated at a broad sampling of hospital emergency departments), and the National Survey of Drug Use and Health (an annual survey conducted in all 50 states which is an authoritative source for epidemiological data on tobacco, alcohol and drug use, mental health, and other health-related issues in the U.S.), inhaling or huffing computer dusters is increasing *exponentially* in terms of frequency, and results in significant numbers of injuries and fatalities on an annual basis. According to the NEISS hospital record database, computer dusters accounted for more ER visits than any other category of inhalant with 16,927 such visits during the period 2011-2018.[92] Moreover, since 2015, 2.5 million people have reported misusing computer dusters[93] and, since 2010, at least 2,316 people have died from

---

[91] *See* Chart: Causal Explanation from Case Reports of Intoxication from DFE and citations thereto, p. 26, *supra*.

[92] Forrester, *supra*, at 180-183.

[93] *See* https://nsduhweb.rti.org/respweb/homepage.cfm. *See also* IV Facts, section B(b), *supra*.

DFE inhalation.[94] Also, the total cost to society of injuries and deaths from aerosol duster abuse "stands at over $1 billion per year."[95]

159.    Defendant Norazza was aware that huffing is a common and foreseeable use of its computer duster products and of the risks posed by this foreseeable use.

160.    Defendant is also aware that DFE has addictive properties and increases the risk of inhalant abuse.

161.    Defendant Norazza also did not add DB, the bitterant, in a proper quantity or manner to deter huffing. Ostensibly to deter the foreseeable use of huffing, Defendant re-designed the computer dusters at issue to add the bitterant DB. Defendant included the bitterant under pressure from their retail partners who began refusing to sell dusters without bitterant in their stores.[96]

162.    Each of the computer dusters contain approximately .01% of the bitterant DB.

163.    Defendant followed the same patented procedure pertaining to addition of bitterant as other manufacturers of computer dusters. Specifically, DB is added in a solid form to the liquified DFE gas aerosol at a target quantity of 5 to 50 parts per million (ppm). DB is dissolved in the liquified DFE gas aerosol and theoretically is intended to mix evenly throughout the can so

---

[94] https://www.cpsc.gov/Data. *See also* U.S. CONSUMER PRODUCT SAFETY COMMISSION, STAFF BRIEFING PACKAGE – AEROSOL DUSTER PETITION, July 26, 2023, at OS 72, https://www.cpsc.gov/s3fs-public/Petition-Requesting-Rulemaking-to-Establish-Safety-Standard-for-Aerosol-Duster-Products-Petition-CP-21-1.pdf?VersionId=.NohA6DG6WsXh_tsjhGuA7RuqMCOvxSW

[95] *See also* U.S. CONSUMER PRODUCT SAFETY COMMISSION, STATEMENT FROM COMMISSIONER RICH TRUMKA, JR., August 2, 2023, https://www.cpsc.gov/s3fs-public/RCAPetitionRequestingRulemakingtoEstablishSafetyStandardforAerosolDusterProductsPetitionCP21_1.pdf?VersionId=nQcgEM4wvCJE97zmhwYCdAkwuluYerIt

[96] *See* IV Facts, Section E, *supra*.

it may be expressed from the can in the same concentration.[97] However, when pressurized and expressed from the can, DB is not present in a sufficient quantity to be detectable, much less aversively bitter.

164.    Defendant affixed labeling to the computer dusters cans at issue which stated "SAFETY BITTERANT ADDED to help discourage inhalant abuse" warranting that the bitterant was safe and had a deterrent effect to prevent huffing.

165.    The DB formulation used by Defendant in the design of its computer dusters is neither safe nor does it have the intended and warranted deterrent effects to prevent use as an inhalant as evidenced by the fact that the incidence of huffing has increased exponentially since bitterant was added to the computer dusters.

166.    Additionally, the selection of DB as a bitterant is problematic because a significant percentage of people cannot taste it in any quantity. Namely, DB is among the class of bitter compounds which cannot be detected by approximately 15-30% of the adult population. These individuals lack a genetic trait which allows them to taste the bitter properties of certain "propylthiourea derivatives."[98]

167.    Due to DB's reduced effectiveness as a deterrent in all cases and its complete ineffectiveness in a large subsection of the population, its inclusion as a safety feature is a design defect.

---

[97] *See* J.A. Creazzo, G.W. Jepson, and G. Mas, Liquified-gas aerosol dusting composition containing denatonium benzoate, United States Patent, US 7,754,096 B2. https://patents.google.com/patent/US7754096B2/en.

[98] *See* U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS (1992). *See also*, Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate, *supra*.

168.    The bitterant chosen by Defendant Norazza, DB, also increases the risk of inhalation of DFE. In addition to the other design flaws described above, DB is a "bronchodilator" that operates to relax the muscles in the lungs. Similar to the effect of an asthma inhaler, DB operates to widen a person's airway upon being inhaled. This is the opposite of the desired effect and renders DB unsafe.

169.    As a result, users who inhale the contents emitted from the computer dusters may breathe in a greater quantity of DFE than if the bitterant were not included at all.

170.    As a direct, substantial, and proximate result of the design defects, users like Tim Piatek, were at an increased risk of becoming addicted to DFE (than if another less or non-addictive substance was used), at an increased risk of inhaling more DFE (than if the bitterant was effective or not included at all), and ultimately at an increased risk of suffering addiction, injury, and/or death by using Defendant's products in the foreseeable manner of huffing.

171.    As a direct, substantial, and proximate result of the design defects, Tim Piatek became addicted to DFE, suffered serious bodily injury, and died due to using Defendant's defectively designed products in the foreseeable manner.

172.    Due to all of these factors, the computer dusters failed to perform safely as a consumer would expect when used in a reasonably foreseeable manner. Based on the overwhelming evidence of injuries and deaths attributed to huffing and Norazza's knowledge of the same, huffing is a reasonable foreseeable manner of use.

173.    In the alternative, due to all of these factors, the risk presented by DFE-based dusters far exceeds the utility of these products.

174.    Moreover, the Defendant is aware of numerous alternative designs or alternative products which are available and do not present the same dangerous risk.

175.     The products at issue share the same common design and manufacturing process, suffer from the same common defects, and these common defects were the cause of Tim Piatek's and other members of the class's addiction, injury, and untimely death.

176.     Plaintiff and members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

### COUNT II:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN

177.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

178.     Plaintiff brings this claim for strict liability pursuant to the Restatement (Second) of Torts § 402A, which Illinois has adopted. Defendant is a manufacturer who produced, designed, and assembled the computer dusters at issue in this case, which include Endust and its private label versions, and placed these products in the stream of commerce.

179.     At all relevant times herein, Defendant's computer dusters were in substantially the same condition as when they left Defendant's control.

180.     At all times relevant herein, Endust and its private label versions were not altered in any way since the time they left Defendant's control.

181.     At the time of sale, Defendant's computer dusters were defective and unreasonably dangerous because the products failed to warn: (1) failed to warn of the known high risk of addiction from the primary ingredient, DFE, accompanied by the risk of withdrawal psychosis; (2) failed to warn of the specific injuries  at risk including permanent brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, and involuntary passing of urine and feces; (3) failed to clearly convey the risk of death; (4) failed to warn that DB was not added in a quantity or manner that would have a deterrent effect; (5) failed to warn that

61

DB is undetectable to a broad swath of the population in any quantity; (6) failed to warn that the bitterant DB has a dilating effect on the respiratory system, which can lead to increased inhalation of DFE, a highly volatile and addictive substance. The general warnings provided by Defendant Norazza were cancelled out by reassuring consumers that its products were designed to prevent abuse.

182.    Defendant knew or should have known by exercising reasonable care of the defects described herein and the attendant risks they posed to consumers and users.

183.    Defendant had a duty to warn users about these risks.

184.    Each can of computer duster at issue in this case was comprised of 99.9% DFE, a dangerous refrigerant which is highly addictive and can create a euphoric sensation when huffed.

185.    DFE is a volatile substance that stimulates a neuro-chemical reaction that produces euphoria and, with repeated or prolonged use, can cause injury or death and abrupt cessation can induce withdrawal. DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.[99]

186.    Defendant knew or should have known of the risks associated with exposure to DFE, including the risk of permanent brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, involuntary passing of urine and feces, and death as well as the high risk that users could become addicted to inhaling DFE.

---

[99] *See* Chart: Causal Explanation from Case Reports of Intoxication from DFE and citations thereto, at ¶ 72, *supra*.

187.    Despite ample publicly available scientific data on the addictive nature of DFE, Defendant failed to warn of this inherent risk, danger, or hazard in Endust and its private label versions. This failure to warn renders these computer dusters unreasonably dangerous.

188.    Defendant also failed to warn that the bitterant DB was not added in a quantity or in a manner that could ever have a deterrent effect on individuals engaged in the foreseeable use of huffing.

189.    Defendant is aware or should have been aware that, in order to be minimally effective as a deterrent, DB must be added to computer duster cans in a quantity sufficient to be aversively bitter to human taste. Also, even if added to the cans at the minimum threshold level, DB must convert to the gas phase and be expressed from the cans at the same minimum threshold level to achieve a deterrent effect. Yet, the bitterant DB was neither added to the can nor capable of being expressed from the can in sufficient quantities to be detectable, much less aversively bitter.

190.    Defendant failed to warn that the bitterant DB is among a class of compounds which a broad swath of the population cannot taste in any quantity. The ability to detect the bitter taste of DB is a genetic trait which many individuals lack. Defendant knew or should have known that this renders DB an ineffective and unsafe choice of bitterant.

191.    Defendant also failed to warn that the bitterant DB is a bronchodilator that operates to relax the muscles in the lungs and to widen a person's airway when inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk of harmful levels of DFE and increasing the risk a user will become addicted to the substance—the opposite of the purported deterrent effect.

192. These failures to warn rendered Defendant's computer dusters defective and unreasonably dangerous under the Restatement (Second) of Torts § 402A, which Illinois has adopted.

193. Tim Piatek and members of the Class were not adequately warned by the Defendant of the inherent risks, dangers, or hazards of becoming addicted, developing inhalant abuse disorder, becoming injured, or dying from DFE.

194. Tim Piatek and members of the Class were not adequately warned that DB could not deter huffing, was not adequately warned that he may have been among the group of individuals unable to taste DB, and was not adequately warned that he could inhale a deadly quantity of DFE from the computer dusters at issue due to the presence of DB.

195. As a direct, substantial, and proximate result of Defendant Norazza's failure to warn, Tim Piatek suffered addiction, physical injuries, and died.

196. Tim Piatek's and the class's use of Defendant Norazza's products for huffing was reasonably and objectively foreseeable. Indeed, Defendant Norazza was well aware that its products were being used in this manner well before Tim Piatek ever purchased a can of Endust.

197. Plaintiff and members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT III: STRICT PRODUCTS LIABILITY –MANUFACTURING DEFECT

198. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

199. Plaintiff brings this claim for strict liability pursuant to pursuant to the Restatement (Second) of Torts § 402A, which Illinois has adopted.

200.    The aforementioned computer duster products at issue in this case were defective, unreasonably dangerous, not merchantable, and not reasonably suited for the use intended in that they were manufactured in such a manner that in reasonably foreseeable usage, the user would suffer harm and/or death.  Such defects were unreasonably dangerous and ultimately proximately caused and/or contributed to damages including, but not limited to, the resultant death of Tim Piatek and injury and death to thousands of other users.

201.    Defendant Norazza manufactured or had sufficient input into the making of the computer dusters to subject them to liability under this count and sold said computer dusters as a new product. The defects existed at the time the computer dusters left Defendant's control.  Such defects proximately caused and/or contributed to the resultant death of Tim Piatek and injury and death to thousands of other users.

202.    Defendant is a manufacturer who, in whole or in part, produced, designed, and assembled the computer dusters, with an intent to place these products in the stream of commerce.

203.    At all times relevant herein, Defendant's computer dusters were sold as new and in substantially the same condition as when they left Defendant's control.

204.    At all times relevant herein, Endust and its private label versions, were not altered in any way since the time they left Defendant's control.

205.    At the time of their sale and/or use, Defendant's computer dusters possessed numerous latent manufacturing defects that rendered them unreasonably dangerous to an extent beyond which would be contemplated by a consumer with ordinary knowledge common to the community as to its characteristics.

206. Defendant's products do not contain the amount of bitterant called for in the patented design. Thus, in the gas phase, the concentration of DB is far below a level which would be detectable and nowhere near the level that could deter huffing.

207. Defendant manufactured the computer dusters in such a way that the levels of DB present in an individual computer duster can vary significantly.

208. Independent testing shows wild fluctuations in the amount of DB inside the cans despite patented formulation amounts. For example, zero DB was present in the gas phase of the Endust and Norazza's private label Surf onn. cans. These variations are a flaw in the manufacturing process and a deviation from Defendant's design specifications.

209. These levels are less than the recognized level at which a bitterant would be detectable to humans.

210. Despite these fluctuations, Defendant failed to ensure that their products were manufactured to meet the patented formulation.

211. Defendant failed to adequately test manufactured products to determine if the bitterant they advertise as being safe and a deterrent was added in a proper manner to perform as warranted, specifically to "discourage inhalant abuse" and/or Defendant intentionally failed to add the proper amount of bitterant to cut costs and increase profits.

212. The manufacture of Defendant's computer dusters does not have the intended and warranted deterrent effects to prevent use of its products for huffing as evidenced in part by the fact that the incidence of huffing has increased exponentially since bitterant was added to the dusters.

213. Defendant knew or should have reasonably known that these variations in amounts of DB in final products could lead to inhalant addiction, inhalant abuse disorder and, ultimately, death and concealed the same.

214. Due to these manufacturing defects, Defendant's products, when sold, were not merchantable and reasonably suited for their intended use.

215. The defective products at issue were the proximate cause of Tim Piatek's addiction, injury, and untimely death.

216. Defendant knew or should have reasonably known by exercising reasonable and/or ordinary care of the defects described herein and the attendant risks they posed to consumers and users and concealed the same.

217. As a direct and proximate result of the aforementioned manufacturing defects, Plaintiff and members of the Class have suffered damages including, but not limited to, special, general, pecuniary and other damages.

## COUNT IV: NEGLIGENT DESIGN DEFECT

218. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

219. Plaintiff brings this claim for negligence pursuant to the Restatement (Second) of Torts § 402A, which Illinois has adopted.

220. Defendant Norazza is a manufacturer who produced, manufactured, designed, and assembled the products at issue in this case, which include Endust and its private label versions, and placed these products in the stream of commerce.

221. As a manufacturer, Defendant had a duty to exercise reasonable care in the design of the computer dusters at issue in this case. Defendant should have known, in the exercise of

ordinary care, that the computer dusters were unreasonably dangerous and would be hazardous to someone.

222. For example, Defendant utilized the volatile chemical compound DFE as the primary substance in its computer dusters, despite its known addictive properties.

223. DFE is a highly addictive, volatile substance that stimulates a neuro-chemical reaction that produces euphoria and with repeated or prolonged use can cause injury or death and abrupt cessation can induce withdrawal. DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.

224. By defectively designing a product that utilizes a highly addictive chemical compound known to encourage use for huffing and cause injury, including death, Defendant breached the standard of care required of a reasonable manufacturer and owed to consumers and users of its products.

225. Further, Defendant assumed a voluntary and additional duty to make the computer dusters "safe" by adding a substance, DB, to the duster cans as a bitterant, purportedly to deter inhaling abuse. Yet, Defendant failed to add DB in the proper quantity and manner to render DFE aversively bitter.

226. Each computer duster can consists of approximately .01% of the bitterant DB.

227. Defendant followed the same patented procedure as other manufacturers in the industry to add DB to the computer duster at issue in this case. In the gas phase, the concentration

of DB is far below a level which would be detectable and nowhere near the level that could prevent huffing.

228.     Specifically, according to the patent that the Defendant followed, DB is added in a solid form to the liquified DFE gas aerosol at a target quantity of 5 to 50 parts per million (ppm). DB is dissolved in the liquified DFE gas aerosol and theoretically is intended to mix evenly throughout the can.

229.     However, when placed under pressure and expressed from the can, DFE and the small quantity of the bitterant DB are converted to a gas vapor. Pursuant to the patented design for addition of the bitterant, in the gas phase the concentration of DB is only 50 to 500 ppb.

230.     At 50 to 500 ppb, the concentration of DB is at best *recognizably* bitter but does not rise to the level of being *aversively* bitter, which is the scientifically-validated threshold at which DB would deter inhalant abuse.

231.     Defendant did not even add the amount of bitterant called for in the patented design. Thus, in the gas phase, the concentration of DB is far below a level which would be detectable and nowhere near the level that could deter huffing.

232.     The DB formula concentration used by Defendant in the design of their computer dusters does not have the intended and warranted deterrent effects to prevent use for huffing as evidenced by the fact that the incidence of huffing has increased exponentially since bitterant was added to the dusters.

233.     Defendant Norazza was aware that huffing is a common and foreseeable use of its computer duster products and of the risks posed by this foreseeable use

234.     DB is also an ineffective choice of bitterant. Namely, DB is among the class of bitter compounds which cannot be detected by approximately 15-30% of the adult population.

These individuals lack a genetic trait which allows them to taste the bitter properties of certain "propylthiourea derivatives."[100]

235.    DB is not only ineffective as a deterrent to huffing, but actually increases the risk and amount of DFE inhalation.

236.    DB is a "bronchodilator" that operates to relax the muscles in the lungs and to widen a person's airway upon being inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk a user will become addicted to DFE and increasing the risk of inhaling a deadly quantity of the substance. Defendant therefore failed to exercise reasonable care in making the warranted safety modifications; instead, it made the computer dusters less safe and therefore breached their voluntarily assumed duty.

237.    At the time of manufacture, Defendant knew or should have known the risk posed by the design of the product at issue and the failure of that design to deter huffing.

238.    As a direct, substantial, and proximate result of Defendant's breach of its duties users like Tim Piatek, were at an increased risk of becoming addicted to DFE (than if another less or non-addictive substance was used), unable to taste the bitterant (either due to its  ineffective composition or because they lacked the ability), at an increased risk of inhaling more DFE (than if the bitterant were not included at all), and ultimately at an increased risk of suffering injury, including death by using Defendant's products.

---

[100] *See* U.S. CONSUMER PRODUCT SAFETY COMMISSION, FINAL REPORT: STUDY OF AVERSIVE AGENTS, (1992). *See also*, Cosmetic Ingredient Review Expert Panel. (2008). Final report of the safety assessment of Alcohol Denat., including SD Alcohol 3-A, SD Alcohol 30, SD Alcohol 39, SD Alcohol 39-B, SD Alcohol 39-C, SD Alcohol 40, SD Alcohol 40-B, and SD Alcohol 40-C, and the denaturants, Quassin, Brucine Sulfate/Brucine, and Denatonium Benzoate, supra.

239. As a direct, substantial, and proximate result of the design defects, Tim Piatek became addicted to DFE, suffered serious bodily injury, and died due to using Defendant's negligently designed products in the foreseeable manner.

240. Plaintiff and members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT V: NEGLIGENT FAILURE TO WARN

241. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

242. Plaintiff brings this claim for negligence pursuant to the Restatement (Second) of Torts § 402A, which Illinois has adopted.

243. Defendant is a manufacturer who produced, designed, manufacatured, and assembled the products at issue in this case, which include Endust and its private label versions, and placed these products in the stream of commerce.

244. At all relevant times herein, Defendant's computer dusters were in substantially the same condition as when they left Defendant's control.

245. At all times relevant herein, Endust and its private label versions, were not altered in any way since the time they left Defendant's control.

246. As manufacturers, Defendant had a duty to exercise reasonable care to prevent its products from being unreasonably dangerous by providing adequate warnings on these products that are clear, correct, and conspicuous to consumers and users.

247. At the time of sale, Defendant's computer dusters were defective and unreasonably dangerous because the products failed to warn: (1) of the known high risk of addiction from the primary ingredient, DFE, accompanied by the risk of withdrawal psychosis; (2) of the specific

71

injuries at risk including permanent brain damage, cardiac arrest, sudden suffocating death, skeletal fluorosis, psychosis, kidney and liver damage, and involuntary passing of urine and feces; (3) clearly the risk of death; (4) that DB was not added in a quantity or manner that would have a deterrent effect; (5) that DB is undetectable to a broad swath of the population in any quantity; (6) that the bitterant DB has a dilating effect on the respiratory system, which can lead to increased inhalation of DFE, a highly volatile and addictive substance. The general warnings provided by Defendant Norazza were cancelled out by reassuring consumers that its products were designed to prevent abuse.

248. Defendant knew or should have known by exercising reasonable care of the foregoing defects described herein and the attendant risks they posed to consumers and users.

249. Defendant had a duty to warn consumers and users about these risks.

250. Each can of computer duster at issue in this case was comprised of 99.9% DFE, a dangerous refrigerant which is highly addictive and can create a euphoric sensation when huffed.

251. DFE is a volatile substance that stimulates a neuro-chemical reaction that produces euphoria and with repeated or prolonged use can cause injury or death and abrupt cessation can induce withdrawal. DFE effects the brain after an individual begins to engage in huffing because it is lipophilic (meaning it dissolves in liquids or fats), crosses the blood-brain barrier, affects the central nervous system, stimulates GABA receptors, and inhibits NMDA receptors all of which combine to create an intense high with a depressant effect, euphoria, loss of coordination, motor control and consciousness.

252. Defendant knew or should have known of the risks associated with exposure to DFE, including the risk of permanent brain damage, cardiac arrest, sudden suffocating death,

skeletal fluorosis, psychosis, kidney and liver damage, involuntary passing of urine and feces, and death as well as the high risk that users could become addicted to inhaling DFE.

253.    Defendant also failed to warn that the bitterant DB was not added in a quantity or in a manner that could ever have a deterrent effect on individuals engaged in the foreseeable use of huffing.

254.    DB is ineffective as a bitterant. Defendant followed the same patented procedure to add DB to Endust and its private label versions that other manufacturers of computer duster followed. Specifically, DB is added in a solid form at a target quantity of 5 to 50 ppm. DB is dissolved in the liquified gas aerosol and theoretically is intended to mix evenly throughout the can and be expressed from the can in an amount which makes DFE aversively bitter. However, in the gas phase, the concentration of DB is far below this level and nowhere near the level that could potentially deter huffing.

255.    Defendant failed to warn that the bitterant DB is among a class of bitter compounds which cannot be detected by approximately 15-30% of the population. Selection of DB as a bitterant despite its ineffectiveness in a large subsection of the population constitutes negligence.

256.    Defendant also failed to warn that the bitterant DB is a "bronchodilator" that operates to relax the muscles in the lungs and to widen a person's airway upon being inhaled, similar to the effect of an asthma inhaler, thereby increasing the risk a user will become addicted to DFE and increasing the risk of inhaling a deadly quantity of the substance—the opposite of the purported deterrent effect.

257.    Defendant failed to warn ordinary consumers, including Tim Piatek, about the addictive properties of DFE, failed to warn that DB was ineffective as a bitterant in the quantity and manner it was added to the computer dusters, failed to warn that he could be unable to taste

73

DB, and failed to warn of the increased risk of DFE inhalation due to the dilating effects that DB has on the respiratory system.

258.    These failures to warn rendered Defendant's computer dusters defective and unreasonably dangerous.

259.    Tim Piatek and members of the Class were not adequately warned by the Defendant of the inherent risks, dangers, or hazards of becoming addicted, developing inhalant abuse disorder, becoming injured, or dying from DFE.

260.    Tim Piatek and members of the Class were not adequately warned that DB could not deter huffing, was not adequately warned that he may have been among the group of individuals unable to taste DB, and was not adequately warned that he could inhale a deadly quantity of DFE from the computer dusters at issue due to the presence of DB.

261.    As a direct, substantial, and proximate result of these negligent failures to warn, Tim Piatek suffered addiction, physical injuries, and subsequently died.

262.    Tim Piatek's and the class's use of Defendant Norazza's products for huffing was reasonably and objectively foreseeable. Indeed, Defendant Norazza was well aware that its products were being used in this manner well before Tim Piatek ever purchased a can of Endust.

263.    At all relevant times, Defendant expressly warranted that Endust and its private label versions were safe, of merchantable quality, and adequately fit for foreseeable use.

264.    At all relevant times, Defendant made these warranties through their website, product labeling, and product descriptions, including public assurances of safety that were intended to create demand for their computer dusters.

265.    At all relevant times, Defendant encouraged retailers to sell their dusters in multi-packs and market them in high visibility end caps without regard for quantity of cans sold, despite

knowing that foreseeable use for huffing was prevalent and that huffing was highly addictive and likely to lead to addiction, inhalant abuse disorder, injury and/or death.

266.    At all relevant times, Defendant breached express warranties including "SAFETY BITTERANT ADDED to help discourage inhalant abuse" which was present on each can when the Defendant knew that the bitterant was not safe, did not and in fact would not deter abuse because it was added to the can in an insufficient quantity to act as a deterrent in the gas vapor phase, and could not be detected at any level by a significant portion of the population.

267.    In addition, DB was an inappropriate choice of bitterant due to its dilating effect on the respiratory system.

268.    At all relevant times, Endust and its private label versions did not conform to Defendant's express warranties because each can contained a design defect rendering them unsafe and not reasonably fit. The "bittering agent" did not work as intended or for its advertised purpose and posed a foreseeable risk of harm or death to consumers such as Tim Piatek.

269.    Plaintiff and members of the Class seek the full measure of relief as provided under the law, including damages for pecuniary and non-pecuniary losses, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT VI:  WRONGFUL DEATH

270.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

271.    Plaintiff Spring Piatek is the surviving spouse of Tim Piatek and has been duly appointed Administrator of his estate. As such, Ms. Piatek brings this claim for wrongful death pursuant to the 740 ILCS 180/0.01 *et seq.* (Wrongful Death Act).

272.    As a direct, substantial, and proximate result of Defendant Norazza's wrongful acts set out in Counts I, II, III, IV, V, and IX Tim Piatek was injured and died.

273.    Tim left suriving him the following heirs at law, all of which have sustained pecuniary injury, including but not limited to loss of money, goods, services, society, support, and further caused them to endure mental sorry, grief, anguish, and loss of consortium all to their damage under the statute commonly called the wrongful death Act, 740 ILCS 180/0.01 et seq:

a.    Spring Piatek (Adult Spouse)

b.    Lily Piatek (minor child)

c.    Theodore Piatek (minor child)

274.    Plaintiff and members of the Class seek all available compensatory relief in an amount to be determined at trial and reasonable attorneys' fees and costs.

## COUNT VII: SURVIVORSHIP

275.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

276.    Plaintiff is the Administrator of the estate of Tim Piatek, having been duly appointed by the Circuit Court of Cook County, Illinois County Department – Probate Division. Thus, as the personal representative of Tim's estate, Ms. Piatek brings this claim for survivorship pursuant to 755 ILCS 5/27-6, *et seq*. (the Illinois Survival Act).

277.    As a direct, substantial, and proximate result of Defendant's wrongful acts set out in Counts I, II, III, IV, V and IX, Tim Piatek was injured and died. Tim endured conscious pain and suffering, disability, loss of normal life, disfigurement, and emotional distress/mental anguish after huffing and becoming addicted to Defendant's products until he died from difluoroethane

toxicity, incurred medical expenses related to hospitalization and rehabilitation treatment for his addiction, and incurred loss of income/to be absent from his employment prior to his death.

278.    Had he lived, Tim had claims against Defendant Norazza for strict products liability, negligence, and breach of warranty for his injuries described above. Pursuant to the Illinois Survival Act, 755 ILCS 5/27-6, recovery for these injuries accrues to the legal representative of his estate, Plaintiff Spring Piatek.

279.    Plaintiff seeks all available compensatory relief in an amount to be determined at trial and reasonable attorneys' fees and costs.

## COUNT VIII: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

280.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

281.    Defendant Norazza, as the manufacturer of Endust and its private label versions, impliedly warranted that these computer dusters were of merchantable quality and safe for personal or household use.

282.    An implied warranty of merchantability, contained in the U.C.C. § 2-314, has been codified by Illinois at 810 ILCS 5/2-314.

283.    At the point of sale, Endust and its private label variants contained inherent defects that rendered them unsuitable and unsafe for personal or household use.

284.    Defendant Norazza breached the implied warranty of merchantability in connection with the sale and/or distribution of the computer dusters at issue.

285.    As a direct and proximate result of Defendant's breach of implied warranty of merchantability, Plaintiff and members of the Class have sustained damages in an amount to be determined at trial.

## COUNT IX:  BREACH OF EXPRESS WARRANTY

286. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

287. Defendant Norazza made express affirmations of fact in its warning placed on cans of Endust and its private label variants, warranting that the dusters contained a bitterant which was safe and deters inhalant abuse. Specifically, Defendant warranted "SAFETY BITTERANT ADDED to help discourage inhalant abuse" or other similar language. These statements qualify as express warranties under 810 ILCS 5/2-313.

288. Norazza made these express warranties about product safety through websites, packaging and labeling to assuage retailer concern for rising inhalant abuse injuries and deaths and to keep their defective and unreasonably dangerous products on the shelves.

289. In reality, the bitterant DB was not added at a concentration that would be an effective deterrent and was an inappropriate choice of bitterant in the first instance due to the inability of a broad swath of the population to taste it and due to the dilating effects DB has on the respiratory system. DB rendered Norazza's computer dusters unsafe in direct contradiction to their explicit express warranty.

290. Defendant encouraged retailers to sell their dusters in multi-packs and market them in high visibility end caps without regard for quantity of cans sold, despite knowing that huffing was a prevalent and entirely foreseeable use of their products, due to the highly addictive nature of DFE, and even though the bitterant DB would not deter such use and could increase the risks of inhalation.

291. Defendant's products did not conform to the express warranties made as to product safety.

292.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Class have suffered pecuniary and other losses.

293.     Plaintiff and members of the Class seek recovery of actual damages of an amount to be determined at trial and any other relief that is deemed proper and just.

## COUNT X – WILLFUL AND WANTON CONDUCT

294.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

295.     That the Defendants were under certain duties imposed by law.

296.     In violation of those duties, Defendant Norazza was grossly negligent and/or willful and wanton in the ways claimed above.

297.     That as a direct and proximate result of one or more of the foregoing acts of gross negligence and/or willful and wanton conduct, Plaintiff and members of the Class have suffered pecuniary and other loss.

298.     Plaintiff and all members of the class seek the full measure of punitive damages available under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Class prays for judgment as follows:

A.  An order certifying this action as an Illinois Issue Class Action, designating Plaintiff as the representative of the Class and appointing Plaintiff's counsel as Class counsel for the Illinois Issue Class;

B.  An order declaring that Defendant Norazza:

i.   Is strictly liable as a "product seller," including a manufacturer, who sells any product in a defective condition unreasonably dangerous to the user or consumer which thereby causes physical harm;

79

ii. Is strictly liable as a "product seller," including a manufacturer, who fails to prevent a product from being unreasonably dangerous by providing adequate warnings of known dangers;

iii. Is negligent as a "product seller," including a manufacturer, for the negligent design of a product which causes that product to be unreasonably dangerous to the user or consumer and thereby causes physical harm;

iv. Is negligent as a "product seller," including a manufacturer, for the negligent failure to warn of known risks or hazards which make the product unreasonably dangerous to the user or consumer and thereby causes physical harm;

v. Violated the Illinois Wrongful Death Act, 740 ILCS 180/0.01 *et seq.*, which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to an heir at law of the deceased who sustains a loss by reason of the death;

vi. Violated the Illinois Survival Act, 755 ILCS 5/27-6, *et seq*., which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to the legal representative of the decedent's estate for such damages incurred by the decedent prior to death;

vii. Breached the implied warranty of merchantability under Illinois statute 810 ILCS 5/2-314;

viii. Breached express warranties under Illinois statute 810 ILCS 5/2-313; and

ix. Violated Illinois law which provides for compensatory relief of pecuniary, nonpecuniary, and other damages to an heir at law of the deceased who sustains a loss by reason of the death.

C.  A judgment awarding Plaintiff and members of the Class all appropriate damages including punitive damages to be determined at trial;

D.  A judgment awarding Plaintiff and members of the Class pre-judgment and post-judgment interest in an amount prescribed by law;

E.  A judgment awarding Plaintiff and members of the Class costs and fees, including attorneys' fees, as prescribed by law; and

F.  Grant such other legal, equitable, or further relief as the Court may deem just and proper.

G.  Plaintiff requests a trial by jury for all issues so triable.

Dated: May 20, 2024

Respectfully submitted,

/s/ *Stephen Phillips*
Stephen D. Phillips, IL Bar #6189372
Stephen J. Phillips, IL Bar #6330289
Phillips Law Offices
161 N Clark St #4925,
Chicago, IL 60601
Telephone: (312) 346-4262
sphillips@phillipslegal.com
sjphillips@phillipslegal.com

Rex A. Sharp, KS Bar #12350 (pro hac forthcoming)
Ruth Anne French-Hodson, KS Bar #28492 (pro hac forthcoming)
Sharp Law, LLP
4820 W. 75th St.
Prairie Village, KS 66208
Telephone: (913) 901-0505
Fax: (913) 261-7564
rsharp@midwest-law.com
rafrenchhodson@midwest-law.com

Austin P. Brane, (pro hac forthcoming)
Wagstaff & Cartmell
4740 Grand Ave., Suite 300
Kansas City, MO 64112
Telephone: (816) 701-1100
abrane@wcllp.com

*Counsel for Plaintiff Spring Piatek*

Letters of Office – Decedent's Estate                                          CCP 0415

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT – PROBATE DIVISION

Estate of

Timothy J. Piatek

_____
                        Deceased

Case Number: _____2022P005885_____

Docket: _____

Page: _____

### LETTERS OF OFFICE – DECEDENT'S ESTATE

  SPRING PIATEK   has been appointed   Independent  Administrator, of the estate of  Timothy J. Piatek  , deceased, who died  Wednesday, 05/25/2022   , and is authorized to take possession of and collect the estate of the decedent and to all acts required by law.

LS

Witness: _____01/31/2023_____
                        IRIS Y MARTINEZ
                        Clerk of the Circuit Court

### CERTIFICATE

I certify that this is a copy of the letters of office now in force in this estate. .

Theresa Grubbs at Probate Division

Witness: _____Monday, 02/27/2023_____

_____IRIS Y MARTINEZ_____
                        Clerk of Court

IRIS Y MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**Exhibit A**                    Printed: 2/27/2023 11:29 AM

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT – PROBATE DIVISION

)
)
)      General Order
)
)

### GENERAL ORDER
### CONCERNING LETTERS OF OFFICE

This Order is entered in response to reports of third party refusal to accept letters of office for lack of a raised seal.

### IT IS HEREBY ORDERED THAT EFFECTIVE IMMEDIATELY:

1. The Clerk of the Circuit Court of Cook County (the "Clerk") no longer issues raised seals on letters of office. The Clerk's office now exclusively uses electronic seals. Electronic seals shall be sufficient evidence of the validity of letters of office. Third-parties shall rely on this General Order and accept the electronic seal affixed to letters of office without a raised seal.

2. Any third party's refusal to accept letters of office for lack of a raised seal will subject them to appear before the court via motion or petition seeking reimbursement for the costs parties incur as a result of the third party's refusal to accept letters of office with an electronic seal, including attorney's fees.

3. Attorneys and estate representatives may present this General Order to any third party who refuses to accept letters of office for lack of a raised seal.

Dated: September 12, 2022      Enter: _____

                             Daniel B. Malone
                    Presiding Judge – Probate Division

```
E N T E R E D
Judge Daniel B. Malone-2012
SEP 1 2 2022
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
```